# Smith v. Speed.

*Mandamus against State Auditor, at Suit of Superintendent of Public Instruction.*

1. *Judicial notice of public historical facts.* — In this case, the court takes judicial notice of the fact, as a matter of public history, that the evil sought to be remedied by the "funding act" of Dec. 19, 1873, in requiring county treasurers, under penalties, to pay into the treasury the identical moneys received by them in payment of taxes, was speculation by those officers in warrants issued by the State; and also

[Smith v. Speed.]

of the historical fact, that the purpose of the constitutional provision, "No money shall be drawn from the treasury but in pursuance of an appropriation made by law," was to prevent the executive power from controlling the public moneys, and not to restrict the legislative power.

2. *Repeal of statute by implication.* — That a statute may be repealed by implication, by a repugnant statute of later date, is an acknowledged principle of law; but the courts do not favor the principle, and never act upon it, if, by any fair and reasonable construction, the two statutes may be reconciled, and an appropriate sphere of operation left to each.

3. *Act of April* 19, 1873, "*to keep in each county a proportionate share of the public school money,*" *not repealed by* "*funding act*" *of Dec.* 19, 1873. — The act approved April, 19, 1873, entitled "An act to keep in each county a proportionate share of the public school money" (Session Acts 1872–73, pp. 6–9), which requires the auditor to draw his warrant on each county tax-collector, in favor of the county treasurer, for ninety per cent. of the amount of school money which the county will be entitled to receive, as proximately ascertained and certified to the auditor by the superintendent of public instruction; and directs the tax-collector to pay to the treasurer, out of the moneys collected by him for taxes, the amount specified in this warrant, taking the treasurer's receipt, which is made receivable by the auditor as a voucher in favor of the tax-collector, is not repealed by those provisions of the act approved December 19, 1873, entitled "An act to provide for the funding of the domestic debt of the State" (Session Acts 1873, pp. 45–56), which require the tax-collector, under heavy penalties, to pay into the treasury the identical moneys received by him in payment of taxes, and forbids its use by him for any other purpose.

4. *Constitutionality of act of April* 19, 1873, *requiring public school moneys to be retained in counties where collected.* — The act approved April 19, 1873, entitled "An act to keep in each county a proportionate share of the public school money" (Session Acts 1872–73, pp. 6–9), does not violate either the letter or spirit of the constitutional provision, contained in the 31st section of the 4th article, "No money shall be drawn from the treasury but in pursuance of an appropriation made by law."

5. *Constitutional questions; rule of courts as to decision of.* — This court will not decide a question involving the constitutionality of an act of the legislature, where the record presents any other clear ground on which its judgment may be based.

Appeal from the Circuit Court of Montgomery.

Tried before the Hon. James Q. Smith.

This was an application by petition, by Joseph H. Speed, the superintendent of public instruction, for a *mandamus* against Robert T. Smith, the auditor of public accounts, to compel said auditor to draw his warrant on the tax-collector of Macon county, in favor of the treasurer of said county, for the amount certified to the auditor by said superintendent as ninety per cent. of the public school money to which said county would be entitled for the scholastic year 1874. The petition alleged, that said superintendent, prior to the 2d day of February, 1874, in pursuance of the provisions of the act approved April 19, 1873, entitled "An act to keep in each county in this State a proportionate share of the public school money," apportioned to the several counties the amount of money which each was entitled to receive, and ascertained that said county of Macon was entitled to receive the sum of $6,404.92; that he certified this apportionment to the auditor on the 2d February, 1874, and requested him to draw his warrant on the tax-collector of said county, in favor of the county treasurer, as required by the 3d section of said act, and that said auditor refused to do so. The

[Smith *v.* Speed.]

auditor demurred to the petition, assigning four several causes of demurrer. The 1st, 2d, and 3d causes of demurrer, though differing in phraseology, substantially averred that, on the facts stated in the petition, the petitioner was not entitled to the writ of *mandamus ;* and the 4th assignment was, that the said act of April 19th was no longer of force. The court over-ruled the demurrer, and the auditor then answered, admitting the facts as alleged in the petition, but averring that the said act of April 19th was repealed by the subsequent statute approved December 19, 1873, entitled "An act to provide for the funding of the domestic debt of the State." To this answer the petitioner demurred, assigning several causes of demurrer, in substance as follows : 1st, that the said act of December 19th is violative of the constitution of the United States, in providing for the emission of bills of credit by the State ; and, 2d, that it is violative of the state constitution, because the subject is not clearly expressed in the title. The court sustained the demurrer, and the defendant declined to plead or answer further ; and thereupon the court rendered judgment, awarding a *mandamus* as asked. To reverse this judgment, the present appeal is prosecuted ; and the several rulings of the court on the pleadings, with the judgment, are now assigned as error.

The material provisions of the two statutes, whose validity and construction are involved in the case, are stated in the opinion of the court.

RICE, JONES & WILEY, for appellant.

ELMORE & GUNTER, *contra.*

BRICKELL, J. — Several questions were presented and argued at the bar. It was insisted by the counsel for the appellant, that the statute of April 19, 1873, was unconstitutional, because it prevented the passage of the public revenue into the state treasury, from which it could be withdrawn only in pursuance of an appropriation made by law. Next, that it was repugnant to the later statute of December 19, 1873, and was thereby repealed ; and that this act was not violative of any provision of the constitution, state or federal. On the reverse of these propositions the appellee insisted.

The first question we propose to consider is, whether the two statutes are so inconsistent that they cannot stand together, — whether by implication the later repeals the former. The third and fourth sections of the act of April 19, 1873, under which the appellee deduces the right to a *mandamus*, in effect declare, that the superintendent of public instruction shall an-

nually apportion to each county the nearest estimate he can make of the school money the county will be entitled to receive for the scholastic year, and shall certify ninety per cent. thereof to the auditor, who shall draw his warrant on the tax-collector of the county for the amount thus certified, to be paid to the county treasurer of the county; and the payment, when made, is accounted as a payment of so much of the school money. The tax-collector is required to pay the warrant, from any state taxes he may receive; and the warrant, when paid, is a voucher for him in the settlement of his accounts with the auditor. Pam. Acts 1872-3, p. 6. These provisions, it is argued, are in conflict with the subsequent statute of December 19, 1873. The fourteenth section of this statute requires the tax-collector, or other receiver of public moneys, to keep and pay into the treasury the *identical money* received from the tax-payer, and forbids its use for any other purpose than payment into the treasury, " in the manner and form in which such money was so received by him." And when he receives any of the obligations authorized by the statute to be issued, he is required to make an entry thereof, in a book kept for that purpose, of date corresponding with the date of the receipt given to the person from whom he received them. This book he is required to exhibit to the auditor, when his accounts are audited. A violation of the provisions of this section is a misdemeanor. The ninth section of the statute forbids the tax-collector, after the 1st January, 1874, from receiving any warrant of the auditor on the treasurer, or any order on the treasurer, in payment of taxes; and also forbids the treasurer from receiving, in payment of any public dues, any warrant or order on the treasury drawn after that date.

Statutes may be repealed by implication. The courts, however, have not favored the principle, and if, by a fair and reasonable construction of a later and a former statute, the two can be reconciled, and each left to operate, that construction is adopted. *Campbell* v. *Wyman*, 6 Port. 219 ; *Kinney* v. *Mallory*, 3 Ala. 626 ; *Stewart George* v. *Skeates & Co.* 19 Ala. 738 ; *Rawls* v. *Kennedy*, 23 Ala. 249. A careful consideration of the act of April, 1873, and of December, 1873, leads me to the conclusion, that there is not only a want of such positive repugnancy between them, as would justify a court in declaring the later a repeal by implication of the former, but that there is not the slightest conflict between their provisions. It is a part of the public history of the State, that there was great complaint of tax-collectors, and other receivers of public moneys, speculating in warrants, which were receivable in payment of taxes and other public dues. Existing laws, though prohibiting and punishing, were found insufficient to

[Smith *v.* Speed.]

prevent it. The public moneys were thus used for private gains. Official delinquency in postponing the payment of the public moneys into the public treasury, so long as there was a hope of converting them at a profit to the tax-collector into warrants and other claims the auditor and treasurer were bound to receive, became, it was said, of frequent occurrence. The law as it stood furnished no adequate means, by which it could be ascertained whether the warrants and other claims tendered by the tax-collector, or other receiver of public moneys, in satisfaction of their liability to the State, had been received from the tax-payer or public debtor, or whether they had paid their taxes or debts in money, which had been used in purchasing these claims. To guard against the fraud and imposition, which had been, or it was supposed had been, practised on the State, by official speculation in public claims, the ninth section of the act provides, that no order or warrant on the treasury, drawn after 1st January, 1874, shall be receivable in payment of public dues. As to warrants or orders previously drawn, the law had so long authorized their reception in payment of public dues, that the faith of the State could well be regarded as pledged to their reception. This pledge could not with propriety be withdrawn, without reasonable notice. Therefore, the prohibition was directed only against such orders or warrants as were drawn after 1st January, 1874. The 10th section requires, that if, after 1st January, 1874, any tax-collector, or receiver of public moneys, should tender in discharge of his liability warrants or orders on the public treasury, drawn prior to 1st January, 1874, he should make oath that they were received by him in good faith, in payment of taxes or public dues, from the person liable therefor, on a day prior to 1st January, 1874. The 12th section makes a false oath in this respect legal perjury, and punishable as such.

A statement of the provisions of this statute shows, that they were intended only to prevent the public officers from speculating with public moneys in public claims, and to compel the payment into the treasury of the identical moneys such officers have received in payment of public dues. The provisions of the statute are adapted to no other purpose, and are fully satisfied when this object is accomplished. The previous statute proposes to accomplish an entirely different purpose. The general assembly, supposing public convenience would be thereby promoted, proposed to keep in each county the larger part of the share of the public school money to which the county is entitled. This money, under the constitution and laws, is derived from, and payable out of the state taxes. To accomplish this purpose, the superintendent of public instruction is required to ascertain and certify to the auditor the amount of school funds

due to each county ; and it is then made the duty of the auditor, to draw his warrant on the tax-collector of the county, in favor of the county treasurer, for ninety per cent. of the amount thus certified. This warrant the tax-collector is required to pay, from any state taxes he may have received. The taxes must have been received, before they can be applied to the payment of this warrant. This statute, therefore, refers to and prescribes the mode in which the tax-collector may make a proper application of the taxes after they have been received, — the application which the constitution and law would have made, if they had been paid into the public treasury. The warrant of the auditor is not by the tax-collector received in payment of taxes, but he applies to its payment the money he has received from the tax-payers in satisfaction of the state tax, with which he was chargeable. The later statute was, as we have said, designed to prevent speculation by public officers in public claims. The former statute does not open the door for, and cannot let in the evils of such speculation. The later statute is intended to secure the payment into the treasury of the identical money received in payment of public dues, and to prevent the officer receiving it from converting it into other funds, which may be receivable in payment of such dues. Between the two statutes there is not, and cannot be, the least possible conflict. Each has a separate and distinct office to perform. The tax-collector discharges himself from liability, to the extent of the auditor's warrant in favor of the county treasurer, when he pays the same with the identical money received from the tax-payer. For any surplus of state taxes he may receive, he may discharge himself from all liability, if he pays into the treasury the identical money received by him from the tax-payer, or the warrants he is authorized to receive, and has in good faith received. Without a most strained construction of its terms, the later statute cannot be regarded as changing or altering any special appropriation of the state taxes, made by previous laws. In its judgment on this point, therefore, the circuit court did not err.

The statute under which the appellee prefers his claim is not, so far as we can perceive, offensive to any provision or clause of the state constitution. It is an ordinary act of legislation, — an exercise of the power over the public revenue which the general assembly certainly possesses, unless restrained or prohibited by the constitution. The constitution contains no such prohibition or restraint. The clause of the constitution supposed to be specially offended is the 31st section of the 4th article : " No money shall be drawn from the treasury but in pursuance of an appropriation made by law ; and a regular statement and account of the receipts and expenditures of all

[Smith *v.* Speed.]

public moneys shall be published annually, in such manner as may be by law directed." A similar clause is found in the federal constitution, and in the constitutions of the several states. In the light of its history, this constitutional provision is conservative, not restrictive or prohibitory of the legislative power over the public revenue. In England, the crown had claimed as one of its highest prerogatives the custody and disbursement of the public revenue, without amenability to the parliament. This claim had been the subject of strife and controversy between King and Commons; and it was only after the lapse of years, that the Commons wrung from the necessities of the Crown an acknowledgment of the principles embodied in this constitutional provision. Forewarned by the history of this strife and controversy, the framers of our constitutions introduced this provision, to prohibit executive power from controlling the public purse. Story on Cons. §§ 1340-2. The provision is mandatory to the treasurer, not to pay, and to the other executive officers, not to draw public money, except in pursuance of an appropriation made by law. It devolves on the general assembly the entire responsibility for the disbursement of the public moneys, and preserves its power over them, that it may be answerable to the responsibility. The legislative power raises the public revenue, and is supreme in its disposition, except so far as it may be restrained or limited by the constitution. In the absence of restraint, it is competent to direct when, where, and to whom the public revenue shall be paid. It may establish such depositories of the public moneys, as in its judgment the public good requires. This statute cannot, in our judgment, therefore, be regarded as violative of the constitution. Attaining these conclusions, the result is an affirmance of the judgment of the circuit court.

A consideration of the delicate constitutional question, to which the argument of counsel was chiefly devoted, whether the statute providing for the funding of the domestic debt of the State is not violative of the provision of the federal constitution, prohibiting the several states from emitting " bills of credit," is not necessary; as its decision would not vary the judgment we think should be rendered. It was long since said, with the approval of C. J. MARSHALL: " The decision of a question involving the constitutionality of an act of Congress is one of the gravest and most delicate of the judicial functions; and while the court will meet the question with the utmost firmness, when its decision is indispensable, it is the part of wisdom, and a just respect for the legislature renders it proper to waive it, if the case in which it arises can be decided on other points." *Ex parte Randolph*, 2 Brock. 447. It is said by Mr. Cooley: " In any case, therefore, where a consti-

[Munter *v.* Rogers.]

tutional question is raised, though it may be legitimately presented by the record; yet, if the record also presents some other and clear ground, upon which the court may rest its judgment, and thereby render the constitutional question immaterial to the case, the court will take that course, and leave the question of constitutional power to be passed upon when a case arises which cannot be otherwise disposed of, and which, consequently, renders a decision upon such question necessary." Cooley on Cons. Lim. 163. The rule thus announced has been uniformly adhered to by the courts, state and federal. We cannot, therefore, feel that it is within our duty or our authority to consider and pass upon this grave and delicate constitutional question. The judgment is affirmed.

B. F. SAFFOLD, J. — I agree with the majority of the court, that there is no necessary and unavoidable conflict between the acts known as the " Funding Act " and the " School Act."

The objections made to the " School Act," that it infringes the state constitution in providing other depositaries for the public revenue than the treasurer, and commits the investigation and passing of public accounts to other officers than the auditor, seem to me to be not without merit. But, as the court is of a different opinion, and the act, for the first time, enforces a separation of the school money from the other revenues of the State, so as to subject it alone to the important purpose for which the constitution solemnly devoted it exclusively, I merely present the objections, as worthy of more extended consideration. I think to make such separation would be the duty of the treasurer without legislation. .

I would greatly prefer to pass upon the objection made to the " Funding Act," that it authorizes the emission of bills of credit. I appreciate the responsibility of a decision, either in favor of, or against, its validity. But the supreme court of the United States, the final arbiter in such cases, is within the reach of the litigants, and no grave consequences need ensue, if we make a mistake in construing the law at this early stage of its operation.