170 So. 178

## STATE v. SOUTHERN NATURAL GAS CORPORATION.

### 3 Div. 173.

Supreme Court of Alabama.

June 11, 1936.

Rehearing Denied Oct. 15, 1936.

82

Cabaniss & Johnston and Jos. F. Johnston, all of Birmingham, for appellee.

A. A. Carmichael, Atty. Gen., and Frontis H. Moore, Asst. Atty. Gen., for the State.

THOMAS, Justice.

The appeal to the circuit court was from an assessment made by the state tax commission. Gen.Acts 1927, p. 181, § 66.

The insistence was that the items included in the computation of the assessment did not constitute capital employed in intrastate business within the state of Alabama and within the purview of section

232 of the Constitution of Alabama. The franchise tax for the year 1931, as provided by the Revenue Act of 1927 (Gen. Acts 1927, p. 176, § 54), was fixed by the state tax commission at $11,047.43, based upon capital employed in Alabama, found to amount to $5,523,715.

The submission for decision by the circuit court was upon an agreed statement of facts; the decision was for that appellant, and the state appealed to this court for a review of the adverse ruling of the circuit court. The agreed statement of facts is aided by exhibits which illustrate that pleading and are to be considered, in testing the correctness of the judgment rendered, as a part of the statement of facts. Grimsley v. First Ave. Coal & Lumber Co., 217 Ala. 159, 115 So. 90.

The record shows that appellee is a Delaware corporation qualified to do business in this state. Its original and amended charter was filed in its qualification under section 232 of the Constitution of Alabama. Its corporate powers are enumerated as follows:

"The charter in brief authorized it to store, transport, buy and sell, oil, gas, salt, brine, and other mineral solutions; to manufacture, acquire, distribute, use and sell artificial gas and to acquire, produce, use and sell the by-products and the residual products therefrom, and construct, maintain, operate, etc., all works necessary; to mine, produce, buy, acquire, use, sell, and distribute natural gas and its by-products and to acquire all works, equipment, and appurtenances necessary therefor; to produce, generate, buy, use and sell a mixture of artificial and natural gas to distribute the same and to construct such ways and works as necessary therefor; to construct, lay, purchase, acquire, maintain, and operate, sell, encumber or otherwise dispose of all necessary pipe lines, gas mains, plants and systems, for the use, sale and distribution of gas, over or under streets, alleys, etc., through private property and to acquire the same by eminent domain; to acquire, manufacture and deal in ice. Also an elaborate enumeration of powers connected with and incidental in the foregoing businesses including the right to sell stocks, bond, etc. * * *

"From the date of the qualification of the Southern Natural Gas Corporation through and including the date of the assessment appealed from, the Corporation *had been qualified to do business as a corporation in the State of Alabama and has had the right to use and enjoy all the powers as authorized by its charter; that it paid a permit fee annually and annually secured the right to do whatsoever it was legally authorized to do in the State of Alabama.* (Italics supplied.)

"At the time of the assessment the corporation maintained its office and chief place of business in the City of Birmingham, Alabama; a majority of orders for gas were received by and cleared through the Birmingham office; all collections for sales were received and disbursements for expenses made or authorized at said office; that the entire management, control and conduct of the business was conducted from said office; the corporation owned and operated automobiles and motor trucks which were used in the maintenance of its pipe lines; the corporation maintains a bank account and has offices and office equipment in Birmingham; the contract under which gas is supplied by the corporation to the Birmingham Gas Company was made and approved in Birmingham; the contract with the Alabama Utilities Service Company was made and executed by the officers of the corporation in Atlanta, Georgia, and the contract under which gas is supplied to the Tennessee Coal, Iron and Railroad Company was made and executed by the officers of the corporation in the City of New York.

"That the subsidiary of the United States Steel Corporation hereinafter referred to is principally the Tennessee Coal, Iron and Railroad Company and other affiliated companies operating steel and industrial plants in the Birmingham district and which are not public utilities but which consume the gas in their own right.

"That the sales to the Tennessee Company and its affiliates are made from time to time upon orders given by the Birmingham office as the needs of such purchasers require; that the gas purchased by these companies is transported into the State through the high pressure transmission system of Southern Natural Gas Corporation, which is made up of the main high pressure line and its numerous laterals, which deliver natural gas to its various customers at the border line of their premises; that in the sales to the Tennessee Company and its affiliates the pressure

is reduced at the point of delivery for the accommodation of the purchaser to meet their needs and requirements. The exact quantities of gas required by the corporation's customers in the State are purchased by the corporation from the producers in the Louisiana and Mississippi fields each day."

The agreed statement of facts further recites:

"Beginning in, to-wit, May, 1929, appellant began the construction of its pipe line for the transmission of natural gas as aforesaid, and by January 1, 1931, appellant had constructed its main lines from the Louisiana fields to Atlanta, Georgia, and Columbus, Georgia, the Columbus line turning South from the Atlanta line at a point near Tuscaloosa, Alabama.

"Appellant has from the outset made use of said transmission line solely for the purpose of transmitting. natural gas, originally from the natural gas fields known as the Monroe field and the Richland field in northeast Louisiana, and subsequently (beginning in the Spring of 1931) including a small proportion ·of gas from the natural gas fields in the vicinity of Jackson, Mississippi.

"Since organization, appellant's business had been the transmission of said gas from the Louisiana and Mississippi fields above-mentioned for sale in the several states mentioned, other than the State of Louisiana, in which no sales were made."

Its contracts for sales are thus stated:

"On January 1, 1931, and thereafter up to and beyond May 13, 1931. (the date of the final assessment herein appealed from), appellant entered into and held no contract for the delivery of natural gas to any person, firm, or corporation within the State of Alabama, except to the following corporations, viz.:

"(a) Alabama Natural Gas Corporation, This corporation was not a consumer of ·gas. It was throughout the year 1931 and prior thereto engaged in the distribution of natural gas purchased from appellant, said Alabama Natural Gas Corporation being a public utility doing business in Alabama in intrastate commerce and subject to regulation by the Alabama Public Service Commission.

"A copy of the contract with Alabama Natural Gas Corporation is hereto attached marked Exhibit A and made a part hereof.

"(b) Southern Cities Public Service Company, a holding company which entered into contract with appellant for the supply of the subsidiary distributing companies of Southern Cities Public Service Company, doing business as public utilities in the State of Alabama, viz.: Alabama Utilities Service Company, Tri-Cities Gas Company, and Mobile Gas Company. None of·said corporations·were consumers of gas. All were and are distributors.

"(c) Birmingham Gas Company and subsidiary or affiliated company (Industrial Gas Corporation), both ˄utilities or distributing companies and not consumers.

"(d) Subsidiaries of the United States Steel Corporation, viz.: Tennessee Coal, Iron & Railroad Company and Universal-Atlas Cement Company, which purchased gas at their respective meter stations and distributed same by their own lines to their several points of operation.

"A copy of the contract with the Tennessee Coal, Iron and Railroad Company is hereto attached marked Exhibit 'B' and made a part hereof."

The delivery of gas is declared to have been made by appellant to all of said purchasers under the following conditions:

"The gas sold to the said purchasers was gas delivered in continuous movement from the gas fields in Louisiana or Mississippi without break or interruption, to the point where it was delivered to and received by the purchaser, viz.: the meter house at which the gas so sold was measured for the purpose of payment.

"In cases of all deliveries made by appellant, the gas was moved under unregulated gas pressure, as produced by the natural pressure of the gas wells, to the designated points of delivery; in all cases in continuous flow' from the Louisiana or Mississippi gas fields without cessation· from the beginning of movement outside of the State of Alabama until delivery."

The industrial activities of the company as affecting its future deliveries are thus indicated:

"The foregoing statement is correct as of January 1, 1931, the accrual date ˄of the tax assessed for such year and upon which this appeal is based. The Company ·had at that time in course of construction pumping, stepping up or compressor stations in the State of Alabama for the purpose of increasing or regulating the pressure and flow of such gas and from time

to time have utilized such equipment since its completion.

"During the year 1931, appellant transacted and proposed to transact no business within the State of Alabama other than the business of selling, transmitting and delivering gas as aforesaid and in the manner hereinbefore set out or business incidental to or directly accessorial to such sale, transmission and delivery, and had no property in the State except as herein stated, used in said business."

Appellant's holdings on January 1, 1931, and during 1931, were "approximately 564 miles of pipe of varying diameter, and various items of real and personal property, located within the State of Alabama, all constituting part of its said general transmission line system and used and held for use in said business."

The agreement of value declared that: "In the event * * * it should be lawfully held in this proceeding that all of appellant's property and assets located within the State of Alabama are to be held to constitute capital employed by appellant within the State of Alabama in the transaction of local business, with respect to which appellant was on the date of the assessment herein appealed from, subject to the assessment of a franchise tax as a foreign corporation transacting local business within the State of Alabama, it is agreed (solely for the purpose of this hearing) that the value of said property as of January 1 to May 13, 1931, was $5,500,000.00, appellant contending, however, that the facts above set out do not constitute the transaction of any local business whatsoever within the State subjecting appellant to a franchise tax under the laws of Alabama in respect thereof, also that, even if such business were subject to a franchise tax, it could be validly levied in respect to that property used and held for use solely in making deliveries to said utilities or distributing companies or in transmitting gas through the State of Alabama into the State of Georgia."

The trial court held that the corporation was not liable for a franchise tax, in that its business was done in interstate commerce, and, if burdened with such tax, it would be in violation of the provisions of the Federal Constitution. Article 1, §§ 8 and 10.

Adverting to the agreement exhibited between appellee and Alabama Natural Gas Corporation, it is recited: "In the event that the Seller shall desire to sell or distribute natural gas to customers other than the Buyer for sale and/or other disposition and/or other utilization in any area covered by this agreement in which the Buyer shall be authorized to sell and distribute gas, the Seller may on the date when the delivery of gas hereunder begins or on any day thereafter give written notice to the Buyer specifying the municipality or territory in respect to which Seller desires to sell gas for distribution . The Buyer shall have one month after the receipt of any such written notice in which to elect * whether or not the Buyer desires to and will undertake to engage in the distribution and/or sale of natural gas in the municipality or territory specified in such notice from the Seller and/or to sell natural gas to the customer or customers proposed to be served as specified in such notice from the Seller and within which to deliver written notice of such election to the Seller. If within any such month the Buyer shall give written notice to the Seller of its election to undertake the distribution and/or sale of natural gas in such territory and/or to sell natural gas to such customer or customers, the Buyer shall proceed forthwith so to do. In the event that (1) Buyer does not within any such month deliver to the Seller written notice of its election to undertake the sale and/or distribution of gas in such municipality or territory and/or to such customer or customers; and/or (2) Buyer fails to proceed forthwith to begin distribution and/or sale of natural gas in such territory and/or to such customer or customers, the Seller shall have the right to enter into contract with others with reference to the sale of and/or distribution of gas in such municipalities or territory and/or to such customer or customers."

The places of delivery are specified to be "at the outlets of the metering stations to be installed by the Seller at such points on Seller's main or branch line and right of way as shall be requested by Buyer (the exact location, however, to be determined by Seller) and Seller shall furnish, install, operate and maintain at its own expense said metering stations, properly equipped with orifice meters, and recording gauges, or such other type of meter or meters of standard style as may be mutually agreed upon, the measurements of which shall fix the total amount of natural gas delivered by the Seller into each of the Buyer's distribution systems. Each metering sta-

tion delivering gas to the Buyer shall, for the purposes of the computation of natural gas deliveries and the ascertainment of the monthly payments hereunder, be deemed to be separate and distinct from every other delivery point, and the deliveries of gas at the several delivery points shall be computed separately and not taken together for said purposes. The metering equipment so installed by the Seller, together with any buildings erected by it for such equipment, shall be and remain its property."

There are stipulations in section 4, subsections (a) and (b), for determining the temperature and specific gravity of the natural gas delivered.

Section 9 of the agreement provides all payments for gas to be made to "the seller at its office in Birmingham, Alabama, on or before the 15th day of the month, for said natural gas deliveries of the preceding month according to the natural gas measurements and computations and at the prices hereinbefore provided for and billed on said monthly statement. Should the buyer fail to pay any amount due from it to the other party when such amount is due, interest thereon shall accrue at six per cent. (6%) per annum from the date when such amount was due to the date of payment. If such failure to pay continues for sixty (60) days, then the seller may discontinue deliveries of natural gas, but the exercise of such right shall be in addition to any and all other remedies otherwise available to the seller."

It is further provided by section 11, that:

"In order to protect buyer's domestic and industrial customers against loss and injury occasioned by interruption of the supply of natural gas herein contracted for and to insure them continuity of service, seller hereby covenants and agrees as follows: * * *

"To use due diligence at all times during the term of this agreement to maintain a reserve supply of natural gas sufficient as to quality and quantity and delivered under pressure adequate fully to meet the needs of all the customers of buyer hereunder.

"In order to equalize, as far as may be practicable, the rates of delivery of gas from seller to buyer during days of maximum delivery and to protect buyer's domestic and industrial customers against interruption of the supply of natural gas herein contracted for, buyer covenants and agrees to utilize the gas holders, if any, for its distribution systems in a practical and skillful manner, in so far as their capacity permits to achieve such results."

In the event of a shortage of natural gas, it is provided:

"In case of a shortage in the supply of natural gas available to seller for delivery to buyer hereunder, it is mutually understood and agreed that the requirements of domestic consumers of the buyers shall be fully supplied from the natural gas delivered hereunder in preference to consumers purchasing natural gas for other than domestic uses (except as to the outstanding industrial contracts transferred by seller to buyer during the term fixed hereby, so long as in full force and effect).

"If for any period of time during the term hereon, the seller shall be unable or fail to deliver the full amount of natural gas required by the buyer and deliverable hereunder, then the buyer shall have the right, during such time as the seller so fails to furnish the required amount of natural gas, to purchase or otherwise obtain, at its own expense, natural gas from any available source or manufactured gas to supply such portions of the requirements of its consumers as is not obtainable from the seller. Any gas manufactured to make up the buyer's requirements which the seller is failing to supply shall be deemed to be supplied to domestic consumers to the extent that such domestic consumers actually were supplied by the buyer and the volume deducted from the current volume for which buyer is to pay the seller at the prices set forth in subdivision (a) of Section 8 hereof."

And section 12 describes the character of the natural gas deliverable under the agreement, as follows: "The natural gas deliverable hereunder shall be natural gas as produced in its natural state from the wells, except that seller may extract or permit the extraction of any helium content and the natural gas gasoline from said natural gas. Seller shall not subject said natural gas, nor permit said natural gas to be subjected to any treatment in the extraction of natural gas gasoline or otherwise which shall substantially change the chemical composition of any of the component parts of said natural gas, nor permit or cause the admission of oxygen or of any other substance which will dilute said natural gas."

The contract of appellee with the Tennessee Coal, Iron & Railroad Company exhibited, contains the following stipulations:

"Seller agrees to complete said line to the delivery points hereinafter described and to begin making deliveries of gas hereunder in quantity and quality and under pressure as hereinafter specified on or before March 1, 1930, and Buyer agrees to receive and pay for the amounts of gas thereafter delivered during the life of this contract and measured under the terms and conditions hereinafter set forth:

"* * * Seller shall supply and Buyer agrees to take natural gas for use in its Bessemer Rolling Mill, its Fairfield Ala. Plant and Ensley Ala. Plant (with the option to discontinue its use in the Ensley Plant as hereinafter set forth) and for resale, for industrial use only, to other subsidiaries of the United States Steel Corporation in the Birmingham District to replace all fuel used in the above-named plants of Buyer and plants of the other subsidiaries of the United States Steel Corporation (except and to the extent that Buyer may elect to use or supply such subsidiaries with its own by-products) and excepting the fuel burned under the Buyer's boilers and the boilers of the other subsidiaries; also excepting from such requirements at the option of Buyer fuel oil for use in emergencies due to shortage of natural gas and fuel used in any of the plants for small miscellaneous purposes. Under this agreement, the Buyer shall not be prevented from buying or exchanging and using fuel oil when and if the Seller is unable to supply natural gas to meet the requirements of the Buyer.

"Seller shall at its own expense provide in advance of the initial delivery date of March 1, 1930, service lines of suitable size to a point mutually agreed upon on the property of Buyer's Bessemer plant. To reach Buyer's Fairfield Plant Seller shall provide a service line that will cross Buyer's Ensley property and run in a southwesterly direction on the property of Buyer to some point mutually agreed upon, on Buyer's Fairfield premises. Buyer agrees that it will make no charge for right of way for any part of the service lines traversing its property. A suitable meter will be provided for metering gas that may be used in the Bessemer plant, in the Ensley plant and in the Fairfield plant of the Buyer and the plants of other subsidiary companies. * * *

"The natural gas shall be delivered at a pressure of not less than 30 pounds gauge at some mutually satisfactory location or locations upon the premises of Buyer, and Seller shall there furnish, install, operate and maintain at its own expense regulating and measuring station or stations properly equipped with orifice meters and recording gauges or other type of meter or meters of standard style as may be mutually agreed upon conformable to the current recommendations of Gas Measurements Committee of American Gas Association, the measurement by which shall fix the total amount of natural gas delivered by Seller to Buyer.

"The measuring equipment so installed by Seller, together with any building erected by it for such equipment, shall be and remain its property. * * *

"The Junkers type of calorimeter for measurement of the heating value of the gas as hereinafter prescribed shall be furnished by the Seller and remain its property. It shall be installed and maintained by the Buyer."

The place of payment and the terms of payment were fixed in this agreement, as follows: "Buyer agrees to pay Seller for natural gas delivered hereunder, beginning with date upon which deliveries of gas shall first be made, payment to be made at the office of Seller, Watts Building, Birmingham, Alabama, on or before the fifteenth (15th) of the month for said natural gas deliveries of the preceding month according to the natural gas measurements and computations, and at the prices hereinbefore provided for and billed on said monthly statement."

■ The provisions for a franchise tax required to be levied on domestic and foreign corporations are stated in sections 229 and 232 of the Constitution. In State v. Bradley, 207 Ala. 677, 93 So. 595, 597, 26 A.L.R. 421, dealing with domestic corporations, it was declared: "The subject of the creator's imposition of this 'franchise tax' is the existence of the corporation, not the 'continued exercise of the corporate franchise.' K. C., M. & B. R. Co. v. Stiles, 182 Ala. 138, 142, 62 So. 734, 735; Id., 242 U.S. 111, 37 S.Ct. 58, 61 L. Ed. 176. A domestic corporation not excepted by the Constitution cannot avoid or escape this 'franchise tax' by even com-

plete corporate inactivity." That is, a domestic corporation, taxed upon its mere existence, pay a franchise tax on its capital stock, etc. Detroit International Bridge Co. v. Corporation Tax Appeal Board of Michigan, 287 U.S. 295, 53 S.Ct. 137, 77 L.Ed. 314.

By section 232 of the Constitution, the Legislature is required to levy a franchise tax on foreign corporations qualifying to do business in the state. The policy of the state as to domestic and foreign corporations is uniform as far as possible; hence the franchise tax on foreign corporations is levied upon the right to do business. This is stated by Mr. Justice Bouldin in Investors' Syndicate v. State, 227 Ala. 216, 149 So. 83, 85, saying: "The franchise tax is for the privilege of exercising corporate functions, and measured by the capital employed in Alabama." Domestic and foreign corporations qualifying enjoy the same powers, protection, and advantages under the law. In State v. Anglo-Chilean Nitrate Sales Corporation, 225 Ala. 141, 142 So. 87, People of the State of New York, ex rel. Parke, Davis, & Company v. Roberts, Comptroller, etc., 171 U.S. 658, 659, 19 S.Ct. 58, 70, 43 L.Ed. 323, Educational Films Corporation of America v. Hamilton Ward, 282 U.S. 379, 51 S.Ct. 170, 75 L.Ed. 400, 71 A.L.R. 1226, and Flint, as General Guardian, etc., v. Stone Tracy Company et al., 220 U.S. 107, 31 S.Ct. 342, 353, 55 L.Ed. 389, Ann. Cas.1912B, 1312, the decisions are to the effect that the tax is "laid *upon the privileges* which exist in conducting business with the advantages which inhere in the corporate capacity of those taxed, and which are not enjoyed by private firms or individuals"; that "it is this distinctive privilege which is the subject of taxation, not the mere buying or selling or handling of goods, which may be the same, whether done by corporations or individuals." 225 Ala. 141, 147, 142 So. 87, 92.

The franchise tax required to be levied on foreign corporations as a prerogative to the right of exercise of its corporate functions in the state is stated in section 232 of the Constitution and the statutes. Acts 1927, p. 176, § 54. The holding of this court is, that the initial requirement of a privilege or franchise tax is for the right to do business in the State (Beard v. Union & American Publishing Company, 71 Ala. 60; Farrior v. New England Mortgage Security Co., 88 Ala. 275, 7 So. 200;

Nelms v. Edinburg-American Land Mortgage Co., 92 Ala. 157, 9 So. 141; Sullivan v. Sullivan Timber Co., 103 Ala. 371, 15 So. 941, 25 L.R.A. 543); and as to this, it has been uniformly held that one act of business before qualification is sufficient to subject to the penalties imposed against foreign corporations doing business without a permit. State v. Bristol Savings Bank, 108 Ala. 3, 6, 18 So. 533, 54 Am. St.Rep. 141; St. Mary's Oil Engine Co. v. Jackson Ice & Fuel Co., 224 Ala. 152, 138 So. 834.

In Investors' Syndicate v. State, 227 Ala. 216, 149 So. 83, 84, it was observed that "this court has recently considered and carefully defined 'capital employed in this State'." in the ascertainment of the annual franchise tax to be exacted annually of a foreign corporation under the Constitution and the statutes (Gen.Acts. 1927, p. 176, § 54), that moneys collected on mortgage loans and deposited in a local bank temporarily for remittance to the home office, moneys stipulated to be in transit to the home office, were not moneys employed in the business in Alabama, and that the book value of real estate purchased at mortgage foreclosure sales, held capital employed within the state. Penn Mut. Life Ins. Co. v. State, 223 Ala. 332, 135 So. 346; State v. National Cash Credit Ass'n, 224 Ala. 629, 141 So. 541.

The case last cited (State v. National Cash Credit Ass'n, 224 Ala. 629, 141 So. 541, 545) involved liability, under section 229, of a foreign corporation holding stock of a domestic corporation for certain franchise taxes; the domestic corporation having "paid the franchise tax on the very stock sought to be made the basis of another franchise tax because of the ownership of such stock by a foreign corporation." The court declined liability under section 232 of the Constitution, and held ownership of property, stock in subsidiary Alabama corporations, money loaned to subsidiary domestic corporations conducting loan businesses, not capital employed in this state; but bills receivable given by borrowers from a foreign corporation conducting a loan business in Alabama constitute capital employed in business in this state within our franchise tax laws. This illustrates the holdings of this court as to its definition of "capital employed in this State" under section 232 of the Constitution and the Revenue Laws, Gen.Acts. 1927, p. 176, § 54.

Section 232 of the Constitution provides: "No foreign corporation shall do any business in this state without having at least one known place of business and an authorized agent or agents therein, and without filing with the secretary of state a certified copy of its articles of incorporation or association. Such corporation may be sued in any county where it does business, by service of process upon an agent anywhere in the state. The legislature shall, by general law, provide for the payment to the State of Alabama of a franchise tax by such corporation, but such franchise tax shall be based on the actual amount of capital employed in this state. Strictly benevolent, educational, or religious corporations shall not be required to pay such a tax."

The statute passed in obedience to the mandate of section 232 of the Constitution, provides: "That every corporation organized under the laws of any other state, nation, or territory, and doing business in this State, except strictly benevolent, educational or religious corporations, shall pay annually to the State an annual franchise tax of Two Dollars ($2.00) on each One Thousand Dollars of the actual amount of capital employed in this State," etc. Gen.Acts 1927, p. 176, § 54.

It is further required by the Constitution and statutes that every foreign or nonresident corporation shall register and obtain an initial and annual permit under the penalties imposed for failure of compliance (Gen.Acts 1927, pp. 171, 172, 173, §§ 42, 43) ; shall be required to make a complete return on the form prescribed by the state tax commission showing the following facts: "First: The date and place of incorporation, and the date such corporation qualified to do business in this State; Second: The total amount of its capital employed in this State; Third: A brief statement of all property, real and personal, owned by the corporation in Alabama, giving the location and value of such property by counties; Fourth: The amount of capital employed in this State which is secured by existing mortgages on real estate in this State, upon which mortgage there shall have been paid the recording privilege tax provided by law; Fifth: Such other detailed information as the State Tax Commission may deem necessary to insure the collection of the tax due." Gen.Acts 1927, pp. 177, 178, § 58. Corporations failing to make such return "shall be subject to a penalty of Ten Dollars a day for each day's failure, unless the time for filing the report has been extended by the State Tax Commission, or unless the State Tax Commission shall for good and sufficient cause remit the penalty provided in this section." Gen.Acts 1927, p. 178, § 59. There are also penalties and forfeitures for initial failures contained in sections 7209, 7211, 7212, 7213, 7216 and 7220 of the Code 1923.

Counsel for the appellee argue that the return made by the Southern Natural Gas Corporation was by way of a precautionary measure to prevent penalties, and, in order to keep its qualifications in effect as to any incidental matters the corporation might desire to do, it made payment "on the basis of a capital employed or to be employed in the transaction of local business in Alabama not exceeding $5,000.00."

It is stated in the return that all capital "employed in Alabama on December 31, 1930, was directly employed or directly held for the transaction of the company's interstate business and no franchise tax is payable in respect thereof." In other words, the insistence is that the imposition of a franchise tax would constitute a direct burden upon interstate commerce, contrary to the provisions of the Constitution of the United States. Article 1, § 10, cl. 2; article 1, § 8; State of Alabama v. Anglo-Chilean Nitrate Sales Corporation, 225 Ala. 141, 142 So. 87, reversed by the Supreme Court of the United States in 288 U.S. 218, 53 S.Ct. 373, 376, 77 L.Ed. 710, on the authority of Ozark Pipe Line Corporation v. Monier et al. etc., 266 U.S. 555, 45 S.Ct. 184, 69 L.Ed. 439, and other recent decisions cited therein. The effect of the federal decisions is thus declared in Anglo-Chilean Nitrate Sales Corporation v. Alabama, 288 U.S. 218, 53 S.Ct. 373, 376, 77 L.Ed. 710, 716:

"The decisions here since New York v. Roberts, supra [171 U.S. [658] 660, 19 S. Ct. 58, 70, 43 L.Ed. 323] definitely show that the power of the state to withhold from a foreign corporation permission to exercise its franchise to do business therein does not enable it, when granting the privilege, to burden by taxation interstate commerce carried on by such corporation within the state. And quite recently in Fidelity & D. Co. v. Tafoya, 270 U.S. 426, 434, 46 S.Ct. 331, 332, 70 L.Ed. 664, we said: 'Thus the right to exclude a foreign corporation can-

not be used to prevent it from resorting to a federal Court, Terral v. Burke Const. Co. 257 U.S. 529, 42 S.Ct. 188, 66 L.Ed. 352, 21 A.L.R. 186; or to tax it upon property that by established principles the State has no power to tax, Western U. Tel. Co. v. Kansas, 216 U.S. 1, 30 S.Ct. 190, 54 L.Ed. 355, and other cases in the same volume and later that have followed it; or to interfere with interstate commerce, Sioux Remedy Co. v. Cope, 235 U. S. 197, 203, 35 S.Ct. 57, 59 L.Ed. 193, [197]; Looney v. Crane Co., 245 U.S. 178, 188, 38 S.Ct. 85, 62 L.Ed. 230 [235]; Western U. Tel. Co. v. Foster, 247 U.S. 105, 114, 38 S.Ct. 438, 62 L.Ed. 1006, 1 A.L.R. 1278 [P.U.R.1918D, 865].' * *

"It follows that the Alabama statute, construed to impose a tax upon appellant for selling in that state in the original packages the nitrate imported by it from Chile, is repugnant to the imports and commerce clauses above quoted. And, as it did no other business in that state, it is not liable for any part of the tax that the state commission assessed against it."

The facts of that case are thus stated:

"All transactions were for cash. The customers received the nitrate only upon payment of the purchase price when they took up the shipping documents through a bank of collection by paying the drafts attached. Such payments were sent to the Merchants' National Bank at Mobile and by it immediately transferred to appellant in New York. Appellant had no bank account in Alabama and paid all expenses there by remittances from New York. On the date as of which appellant's return was made it had no accounts or bills receivable in Alabama and had no money there at any time except during the brief intervals that the funds were being so transmitted. It did not have or employ any capital in that State unless the importation through the port of Mobile, the storage and sale of nitrate in the manner above described constitutes capital and its employment there. * * *

"The stipulation of the parties shows that the only transactions in Alabama in which appellant is concerned are the landing, storage, and sale of the nitrate in the form and packages in which it was put up abroad and transported into the United States. The bags were kept intact, no nitrate was removed therefrom, and, prior to the delivery of the same to those who bought from appellant, it was not in any manner commingled with, and did not become a part of, the general mass of property within the state." 288 U.S. 218, 53 S.Ct. 373, 374, 77 L.Ed. 710, 713, 714.

The effect of the Constitutions and statute in question on the facts recited is declared by Mr. Justice Butler, who observes of the State Constitution and the statute, as follows: "The Alabama statute in question was enacted in pursuance of section 232 of the state Constitution which declares: No foreign corporation shall do any business in the state without having a place of business and an authorized agent therein and without filing with the secretary of state a certified copy of its articles of incorporation. 'The legislature shall, by general law, provide for the payment to the State of Alabama of a franchise tax by such corporation, but such franchise tax shall be based on the actual amount of capital employed in this state.' As to the meaning and purpose of the statute, we are governed by the construction put upon it by the state supreme court." 288 U.S. 218, 53 S.Ct. 373, 374, 77 L.Ed. 710, at page 713.

The insistence made in State v. Anglo-Chilean Nitrate Sales Corporation, 225 Ala. 141, 142 So. 87, and on which the decision in Anglo-Chilean Nitrate Sales Corp. v. Alabama, 288 U.S. 218, 53 S.Ct. 373, 374, 77 L.Ed. 710, 713, was rested, is: "Appellant maintained below and here insists that the section, construed to impose the tax in question, is repugnant to the declarations of the federal Constitution: 'No state shall, without the consent of the congress, lay any imposts or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws,' article 1, § 10, cl. 2, and, 'The congress shall have power * * * to regulate commerce with foreign nations, and among the several states * * *' art. 1, § 8."

The decision by the majority is rested largely upon the concluding words on rehearing in State v. National Cash Credit Ass'n, 224 Ala. 629, 633, 141 So. 541, stated as follows:

"Its [State Supreme Court] decisions clearly show that the exaction is laid, not upon the authorization, right, or privilege to do business in Alabama, but upon the actual doing of business. While the case at bar was pending on appeal there, the state supreme court in State v. National Cash Credit Ass'n, 224 Ala. 629, 632, 141

So. 541, 544, held that *the mere investment in or ownership of property in the state by a foreign corporation does not subject it to the franchise tax*. Adverting to the language of the statute, it declared that the 'property must be employed in a corporate business done in this state.' On rehearing, May 19, 1932, and after its decision in the case before us, that court said: 'We merely hold a franchise tax to be what it purports to be, a tax upon the exercise or use of its franchise in Alabama for the purposes of such franchise; and that, if no corporate activity is conducted in Alabama during the period covered by the tax the corporation does not owe a franchise tax.'" 288 U.S. 218, 53 S.Ct. 373, 374, 77 L.Ed. 710, at page 713. (Italics supplied.)

Adverting again to the decision in State v. Anglo-Chilean Nitrate Sales Corporation, 225 Ala. 141, 142 So. 87, Mr. Justice Butler quotes from that opinion as follows: "In the case at bar the court said: 'The defendant duly qualified as a foreign corporation to do business in this state, appointed a resident agent, and that it actually engaged in business in Alabama by selling its nitrate through a salesman both within and without the state appears as an uncontroverted fact. It seeks to be relieved from this franchise tax solely upon the theory the imported nitrate, the sale of which constituted its business, was immune from state taxation. * * * The statute here under review has no reference to imports, but is merely of a general character relating to the fixation of the amount of a franchise tax upon foreign corporations doing business in this State.' * * * And, after referring to the manner of appellant's acceptance of orders and the collections and remittances, the court said: 'These details go to show the corporation was actually engaged in business in this state. * * *'" 288 U.S. 218, 53 S.Ct. 373, 374, 77 L.Ed. 710, 713, 714.

The Supreme Court of the United States concludes as follows:

"As appellant did no local business in the state, that decision plainly rests upon the assumption that Alabama had power to tax appellant's sales in original packages of the nitrate if imported into that state only for sale and that such sales constituted a business that is taxable under section 54. The Alabama statute is unlike that of Michigan examined here in Detroit International Bridge Co. v. Corporation Tax Appeal Board, 287 U.S. 295, 53 S.Ct. 137, 77 L.Ed. 314, and Michigan v. Michigan Trust Co., 286 U.S. 334, 342, 52 S.Ct. 512, 76 L.Ed. 1136 [1138]. There the tax upon a domestic corporation was imposed for the mere right to transact business. * * *

"The right to import the nitrate included the right to sell it in the original bags while it remained the property of appellant and before it lost its distinctive character as an import. State prohibition of such sales would take from appellant the very rights in respect of importation that are conferred by the Constitution and laws of the United States. Alabama was powerless, without the consent of Congress, to tax the nitrate before such sales or to require appellant by the payment of occupation or franchise tax or otherwise to purchase from it the privilege of selling goods so imported and handled. Brown v. Maryland, 12 Wheat. 419, 436, 442–444, 6 L.Ed. 678 [684, 686, 687]. In that case a state license fee imposed on an importer selling imported goods in the original bales or packages was condemned as repugnant to the imports and commerce clauses. Chief Justice Marshall said (12 Wheat. 419, at page 444, 6 L.Ed. 678): 'All must perceive, that a tax on the sale of an article, imported only for sale, is a tax on the article itself * * * A tax on the occupation of an importer is * * * a tax on importation. It must add to the price of the article, and be paid by the consumer, or by the importer himself, in like manner as a direct duty on the article itself would be made. This the state has not a right to do, because it is prohibited by the constitution.'" 288 U.S. 218, 53 S. Ct. 373, 374, 77 L.Ed. 710, 714, 715.

The effect of the holding in State v. National Cash Credit Ass'n, 224 Ala. 629, 141 So. 541, 544, is not a departure from the long line of our decisions, but merely a definition of the term "capital employed in this state" by foreign corporations within the purview of our cases dealing with the provisions of our Constitution. The mere fact that a distinct and domestic corporation is engaged in a like business in the state, though the latter may be a subsidiary of the foreign corporation, does not justify double taxation by way of an exaction of a franchise tax from the foreign corporation, based solely upon its holding of the stock of the subsidiary. We have by this and will

later further indicate that the two cases (State v. National Cash Credit Ass'n, supra, a definition of the words "capital employed in this State," and State v. Anglo-Chilean Nitrate Sales Corporation, 225 Ala. 141, 142 So. 87, an original package case) do not rule this decision, but are distinguishable from the instant agreed statement of facts. Here, the appellee exercised its right to rely upon federal immunity, if such it had, but applied for a state permit under section 232 of the Constitution to do business in the state, made its return thereunder, and did the acts of business within the state by selling its gas within the terms of its contracts and affiliations indicated in the agreed statement of facts. By its action in the two respects to be indicated, obtained a franchise to do a local business within the state, in addition to such rights as it had under the Federal Constitution to conduct its interstate business and its product from Louisiana and Mississippi to and through Alabama, and to sell the same at retail to consumers here on the one hand, and to their subsidiaries on the other. That is to say, it had the right, freed of penalties, to transport and sell its product at wholesale in its original form and volume within the original package case (State v. Anglo-Chilean Nitrate Sales Corporation, 225 Ala. 141, 142 So. 87; Anglo-Chilean Nitrate Sales Corporation v. Alabama, 288 U.S. 218, 53 S.Ct. 373, 77 L.Ed. 710), or to break or change its condition, character, or flow within this state by the addition of artificial gas, if it so desired, or to reduce its quantity or flow by augmentation or retarding the natural flow or pressure of gas; as from that of natural and fugitive mineral to that of a manufactured product regulated by mechanical contrivance.

Such grant by the state on application of a foreign corporation is well observed by Mr. Justice Cardozo in Anglo-Chilean Nitrate Sales Corp. v. Alabama, 288 U.S. 218, 53 S.Ct. 373, 77 L.Ed. 710, 718, as follows: "By the grant thus procured, it became free, at its unfettered will, to sell at wholesale or at retail, in the original packages or in others, unhampered by the restrictions that would have limited its capacity if it had been there as an importer and with the powers of an importer only. This franchise or privilege, this grant of benefits beyond any conferred by the federal Constitution, the state of Alabama was competent to tax. Home Ins. Co. v. New York, 134 U.S. 594, 10 S.Ct. 593, 594, 33 L.Ed. 1025; Ashley v. Ryan, 153 U.S. 436, 440, 14 S.Ct. 865, 38 L.Ed. 773 [776] [4 I.C.R. 664]; Kansas City, Ft. S. & M. R. Co. v. Botkin, 240 U.S. 227 [36 S.Ct. 261, 60 L.Ed. 617]; Lusk v. Botkin, 240 U.S. 236, 36 S.Ct. 263, 60 L.Ed. 621; St. Louis S. W. R. Co. v. Arkansas, 235 U.S. 350, 35 S.Ct. 99, 59 L.Ed. 265; Kansas City, M. & B. R. Co. v. Stiles, 242 U.S. 111, 117, 37 S.Ct. 58, 61 L.Ed. 176 [186]; Flint v. Stone Tracy Co., 220 U. S. 107, 31 S.Ct. 342, 55 L.Ed. 389, Ann. Cas.1912B, 1312; Educational Films Corp. v. Ward, 282 U.S. 379, 51 S.Ct. 170, 75 L. Ed. 400 [71 A.L.R. 1226]; Pacific Co. v. Johnson, 285 U.S. 480, 489, 52 S.Ct. 424, 76 L.Ed. 893 [896]; Detroit International Bridge Co. v. Corporation Tax Appeal Board, 287 U.S. 295, 53 S.Ct. 137, 77 L. Ed. 314, December 5, 1932. There being competence to tax, there was competence to measure the burden of the payment by capital employed, irrespective of the use to which employment is directed. Educational Films Corp. v. Ward, supra [282 U.S. 379, 51 S.Ct. 170, 75 L.Ed. 400, 71 A.L.R. 1226]; Pacific Co. v. Johnson, supra [285 U.S. 480, 52 S.Ct. 424, 76 L.Ed. 893]; Flint v. Stone Tracy Co., supra [220 U.S. 107, 31 S.Ct. 342, 55 L.Ed. 389, Ann. Cas.1912B, 1312]; Home Ins. Co. v. New York, supra [134 U.S. 594, 10 S.Ct. 593, 33 L.Ed. 1025]. There may be a wrong to the taxpayer if the standard of measurement is oppressive and unreasonable. Western U. Tel. Co. v. Kansas, 216 U.S. 1, 30 S.Ct. 190, 54 L.Ed. 355. There is none where the standard bears a fair and natural relation, in its normal or average workings, to the privilege conferred." 288 U.S. 218, 53 S.Ct. 373, 377, 77 L.Ed. 710, at page 718.

No wrong was done the foreign corporation, voluntarily qualifying under state laws, by the measurement and exaction of a franchise tax under the requirements of the Constitution and the statutes of this state; the standard of measurement employed being reasonable and unoppressive. The state had the right to exact this franchise tax, and the foreign corporation had the right either to qualify or not qualify. If it desired to exceed its rights under interstate commerce, the permit gave this right. Western Union Telegraph Company v. State of Kansas on the Relation of C. C. Coleman, Attorney General, 216

U.S. 1, 30 S.Ct. 190, 54 L.Ed. 355; Western Union Telegraph Company v. Seay, Governor, et al., 132 U.S. 472, 10 S.Ct. 161, 33 L.Ed. 409.

The case of Ozark Pipe Line Corporation v. Roy Monier et al., 266 U.S. 555, 45 S.Ct. 184, 69 L.Ed. 439, was well distinguished, there and here, by the dissenting opinion in Anglo-Chilean Nitrate Sales Corp. v. Alabama, 288 U.S. 218, 53 S.Ct. 373, 379, 77 L.Ed. 710, 720, as follows:

"None of the decisions cited by the appellant controls the case at hand.

"Ozark Pipe Line Corp. v. Monier, 266 U. S. 555, 45 S.Ct. 184, 69 L.Ed. 439, is invoked with special confidence. There are obvious distinctions. The statute of Missouri there held to be invalid in its application to a corporation engaged in interstate commerce was very similar in form to the statute of Alabama in controversy here. The conduct of the aggrieved corporation was, however, very different. Its business was the operation of a pipe line from oil wells in Oklahoma passing through Missouri to a destination in Illinois. Nothing was done in Missouri, or so the court interpreted the evidence, except in furtherance of transportation. Oil was neither received nor delivered in that state. In these circumstances the corporation asked for and obtained from Missouri a license to 'engage "exclusively in the business of transporting crude petroleum by pipe line."' 266 U.S. [555] at pages 561, 567, 45 S.Ct. 184, 187, 69 L.Ed. 439. This, however, was the very business that was incidental to the federal right. The privilege to transport upon the interstate journey was an essential incident of commerce, and so an emanation from the federal power. The court did not hold that the tax would have been unlawful if laid upon a franchise emanating from the power of the state. The court condemned the tax for the reason that it read the statute as designed to lay a burden on the franchise to do business as an interstate carrier."

In Ozark Pipe Line Corporation v. Monier et al., 266 U.S. 555, 45 S.Ct. 184, 187, 69 L.Ed. 439, 444, Mr. Justice Sutherland said: "Some stress is laid upon the fact that the objects and purposes specified in appellant's articles of incorporation are not confined to the transportation of petroleum but include the doing of other business local in character. As to this, it is enough to say that none of these powers were in fact exercised in the state of Missouri; and so far as this case is concerned the power to tax depends upon what was done and not upon what might have been done. Moreover, the license issued by the state authorized appellant to engage 'exclusively in the business of transporting crude petroleum by pipe line.'"

The foregoing excerpt from the Ozark Pipe Line Case distinguishes that case from the instant case.

■ The power to convey its gas to the several meters and its acts in so doing, diversion stations and transmission lines thereto, its devices for measuring the amount of natural or artificial gas, or mixed, if necessary to be supplied for use, augmenting or decreasing the flow, operation, control, and ownership of its switches and meters, use of its office furniture, book accounts, sales contracts, and agents engaged to keep same in Birmingham, Ala., were as much a part of appellee's plant and system operating and doing business and capital employed within the state, as the devices, force, or instrumentalities employed in directing, regulating, and forcing the transmission to the several points of distribution within the state. Brown v. Gerald et al., 100 Me. 351, 61 A. 785, 70 L.R.A. 472, 109 Am.St.Rep. 526; Sloss-Sheffield Steel & Iron Co. v. Mobley, Adm'rx, 139 Ala. 425, 36 So. 181; Wheeling Steel Corporation v. Fox, State Tax Commissioner, 298 U.S. 193, 56 S.Ct. 773, 80 L.Ed. 1143. Such intrastate corporate acts, property holdings, and the use thereof constituted the doing of business in Alabama and the employment of its capital therein by a foreign corporation, within the definition of our decisions cited above, and that of the Supreme Court of the United States in East Ohio Gas Company v. Tax Commission of Ohio et al., 283 U.S. 465, 41 S.Ct. 499, 75 L.Ed. 1171, 1175. Louisville & N. R. Co. v. State of Alabama, 201 Ala. 317, 78 So. 93; Id., 248 U.S. 533, 39 S.Ct. 18, 63 L.Ed. 406; Kansas City, M. & B. R. Co. v. Stiles, Judge, 182 Ala. 138, 62 So. 734; Id., 242 U.S. 111, 37 S.Ct. 58, 61 L.Ed. 176; Wheeling Steel Corporation v. Fox, State Tax Commissioner, supra.

If further demonstration of the doing of an intrastate business and employment of the corporation's capital in this state is necessary, this is shown by its contracts fixing prices required of domestic consumers of its natural gas at 40, 42, 43, and 45 cents per thousand cubic feet; the con-

tract charge to commercial consumers at 18 cents per thousand cubic feet; its contract with the Tennessee Coal, Iron & Railroad Company and its several subsidiaries, under a prescribed graduated scale of from 17 to 25 cents per thousand cubic feet; and its requirement of the latter company to take gas for the use of its Bessemer Mill, its Fairfield and Ensley plants, and the other subsidiaries of the United States Steel Corporation. We know that this mill and these plants in the places named are widely separated. Hodge et al. v. Joy et al., 207 Ala. 198, 92 So. 171. It has been noted that the contracts stipulated deliveries and the points thereof; that such connections were to be made by the seller and the equipment for operation was to remain the property of the seller. It is further required by the contracts that service lines connecting or supplying the Fairfield and Ensley plants be located and constructed in a southwesterly direction on the property of the buyer to some point "mutually agreed upon on the buyer's Fairfield premises"; providing suitable meters that "may be used in the Bessemer Mill and Fairfield and Ensley plants of the buyer and the plants of the other subsidiary companies" of the buyer.

We have noted that contract compliances of sale and payment of gas so taken, furnished, metered, or measured, and payments therefor, were made to the Birmingham office of the seller. What of the domicile of such intangibles? In the recent case of Wheeling Steel Corporation v. Fox, State Tax Commissioner, 298 U.S. 193, 56 S.Ct. 773, 776, 80 L.Ed. 1143, it is said: "When we deal with intangible property, such as credits and choses in action generally, we encounter the difficulty that by reason of the absence of physical characteristics they have no situs in the physical sense, but have the situs attributable to them in legal conception. Accordingly we have held that a state may properly apply the rule mobilia sequuntur personam and treat them as localized at the owner's domicile for purposes of taxation."

On the question of what was the actual situs, the Supreme Court of the United States, after discussing the facts at length, said: "The corporation established in West Virginia what has aptly been termed a 'commercial domicile.' It maintains its general business offices at Wheeling and there it keeps its books and accounting records. There its directors hold their meetings and its officers conduct the affairs of the corporation. There, as appellant's counsel well says, 'the management functioned.' The corporation has manufacturing plants and sales offices in other states. But what is done at those plants and offices is determined and controlled from the center of authority at Wheeling. The corporation has made that the actual seat of its corporate government."

The court then held that the bank accounts and accounts receivable located outside the state were taxable in West Virginia.

While the tax there in question was an ad valorem tax, the basis of the decision was that the home office in reality was in West Virginia.

While counsel for appellee argue that whatever is done in Alabama is incidental to transportation of natural gas in interstate commerce from points without the state, we hold that the franchise tax here exacted and being considered is not on any basis a tax on business or a burden on the corporation's interstate commerce, but is laid on the exercise of corporate functions, or on the privilege of exercising corporate functions within the state and its employment of its capital in Alabama, domiciled at its office in Birmingham within this state. The control of the business in all of its aspects was in Birmingham, as shown by the statement of facts.

The differences, emphasized by Mr. Justice Cardozo in the Anglo-Chilean Case, 288 U.S. 218, 53 S.Ct. 373, 77 L.Ed. 710, 720, between the facts in the Ozark Pipe Line Case, 266 U.S. 555, 45 S.Ct. 184, 69 L.Ed. 439, and those here presented, which differences are likewise emphasized by Mr. Justice Sutherland in Atlantic Lumber Co. v. Commissioner of Corporations, 298 U.S. 553, 56 S.Ct. 887, 80 L.Ed. 1328, take this case out of any influence which the Ozark Pipe Line Case might have. Nor are the facts in the Anglo-Chilean Case comparable with these. In that case there was no maintenance of an office or other corporate functions, or capital employed, other than the storage of imports in original packages accompanied by qualification to do business in Alabama. All the orders and corporate management were done in New York.

Under the contracts exhibited and the conduct of business within the state as shown by the agreed statement of facts, the decision in East Ohio Gas Company v. Tax Commission of Ohio et al., 283 U.S.

465, 471, 472, 51 S.Ct. 499, 501, 75 L.Ed. 1171, 1175, is conclusive of the question for decision. Mr. Justice Butler declared as follows:

"Appellant relies on Pennsylvania Gas Co. v. Public Serv. Commission, 252 U.S. 23, 40 S.Ct. 279, 64 L.Ed. 434 [P.U.R. 1920E, 18]. There the question was whether the New York commission had jurisdiction to prescribe the rates to be charged local consumers of gas transported to that state from Pennsylvania. This court, following the findings of the highest court of New York (225 N.Y. 397, 403, 404, 122 N.E. 260, [P.U.R.1919C, 663]), held that the entire movement of the gas was interstate commerce, and that, in the absence of contrary regulation by the Congress, the state commission had jurisdiction to prescribe such rates. The theory on which that conclusion was reached is not wholly consistent with the views expressed in Public Utilities Commission v. Landon, supra [249 U.S. 236, 239, 39 S.Ct. 268, 63 L.Ed. 577, P.U.R.1919C, 834], and in Missouri ex rel. Barrett v. Kansas Natural Gas Co., supra [265 U.S. 298, 44 S.Ct. 544, 68 L. Ed. 1027]. In the former the court said at page 245 of 249 U.S., 39 S.Ct. 268, 270: 'Interstate movement (of natural gas being transported from State to State) ended when the gas passed into local mains.' In the latter, it was said at page 308 of 265 U.S., 44 S.Ct. 544, 546: 'With the delivery of the gas (transported from one State to another) to the distributing companies * * * the interstate movement ends. Its subsequent sale and delivery by these companies to their customers at retail is intrastate business and subject to state regulation. * * * In such case the effect on interstate commerce, if there be any, is indirect and incidental. * * * The business of supplying, on demand, local consumers is a local business, even though the gas be brought from another state and drawn for distribution directly from interstate mains; and this is so whether the local distribution be made by the transporting company or by independent distributing companies. In such case the local interest is paramount, and the interference with interstate commerce, if any, indirect and of minor importance.' * * *

"The mere fact that the title or the custody of the gas passes while it is en route from state to state is not determinative of the question where interstate commerce ends. * * * But when the gas passes from the distribution lines into the supply mains, it necessarily is relieved of nearly all the pressure put upon it at the stations of the producing companies, its volume thereby is expanded to many times what it was while in the high pressure interstate transmission lines, and it is divided into the many thousand relatively tiny streams that enter the small service lines connecting such mains with the pipes on the consumers' premises. So segregated the gas in such service lines and pipes remains in readiness or moves forward to serve as needed. The treatment and division of the large compressed volume of gas is like the breaking of an original package, after shipment in interstate commerce, in order that its contents may be treated, prepared for sale, and sold at retail."

The recent case of Atlantic Lumber Co. v. Commissioner of Corporations, 298 U. S. 553, 56 S.Ct. 887, 888, 80 L.Ed. 1328, decided May 25, 1936, supports our cases of Friedlander Bros., Inc., v. Deal et al., 218 Ala. 245, 118 So. 508, and Muller Manufacturing Co. v. First National Bank of Dothan, 176 Ala. 229, 57 So. 762. Mr. Justice Sutherland, commenting on the Ozark Case, concludes the opinion in the Atlantic Lumber Co. Case as follows: "There, a Maryland corporation owned and operated a pipe line extending from Oklahoma through Missouri to Illinois, by which crude petroleum was carried from Oklahoma to Illinois. No oil was received or delivered in Missouri. The license issued by the state was to engage 'exclusively in the business of transporting crude petroleum by pipe line.' The company, it is true, maintained its principal office in Missouri and there kept its books and bank accounts, paid its employees, purchased supplies, employed labor, maintained telephone and telegraph lines, and carried on various other activities; but all were linked exclusively to the pipe line and operated only to further the flow of oil in interstate commerce. Neither property nor activities were anything more than aids to the operation of the pipe line; and together with that line they combined to constitute in practical effect an instrumentality of that commerce. Thus, the burden of the tax which the state imposed fell upon interstate transportation immediately and directly, while here the effect upon interstate commerce, so far as there is any, is remote and incidental—a distinction which, in respect of

such legislation as we are now considering, marks the line between a tax which is valid and one which is not." Atlantic Lumber Co. v. Commissioner of Corporations, 298 U.S. 553, 56 S.Ct. 887, 888, 80 L. Ed. 1328, May 25, 1936.

We are of the opinion, and hold, that the instant corporation functioned under its charter and the privileges granted by the state under the Alabama Constitution and statute; conducted its business, employed its capital in the state in the sale of natural gas to local consumers by wholesale and retail, and was subject to the franchise tax fixed and imposed and adjudged by the state tax commission from which its appeal was taken. · See recent cases by this court: Wisconsin Coosa Co. v. State, 231 Ala. 543, 165 So. 838; Gray-Knox Marble Co. v. Times Bldg. Co. et al, 225 Ala. 554, 144 So. 29; Cobb v. York Ice Machinery Corporation, 230 Ala. 95, 159 So. 811; Ford Motor Co. v. Hall Auto Co., 226 Ala. 385, 147 So. 603.

The decree of the circuit court is reversed, and the cause is remanded.

Reversed and remanded.

ANDERSON, C. J., and BROWN and KNIGHT, JJ., concur.

## On Rehearing.

THOMAS, Justice.

Upon a reconsideration of this cause, we discover no new question presented for discussion. We rest content with our original opinion on the merits.

In entering the judgment here, the case was reversed and remanded, overlooking for the moment that the trial was had on an agreed statement of facts, in which case it is usual to render the judgment here which the lower court should have rendered. No reason now appears why the usual rendition of judgment should not be entered. Of our own motion we modify the former judgment of reversal and render a final judgment here for the state, rather than remand the case. It is so ordered.

The amount due on October 15, 1936, is $15,466.69.

Reversed and rendered.

ANDERSON, C. J., and BROWN and KNIGHT, JJ., concur.