89 So.2d 549

**STATE of Alabama**

v.

**PLANTATION PIPE LINE COMPANY.**

**3 Div. 735.**

Supreme Court of Alabama.

Aug. 2, 1956.

Rehearing Denied Sept. 13, 1956.

Writ of Certiorari Denied Dec. 10, 1956.
See 77 S.Ct. 263.

John Patterson, Atty. Gen., and Willard W. Livingston and Wm. H. Burton, Asst. Attys. Gen., for appellant.

Cabaniss & Johnston, Jos. F. Johnston and E. T. Brown, Jr., Birmingham, for appellee.

**STAKELY, Justice.**

The State Department of Revenue made an assessment for franchise taxes under the provisions of § 348, Title 51, Code of 1940, covering the tax year 1952 against Plantation Pipe Line Company, a corporation, in the amount of $22,655. Plantation Pipe Line Company appealed from the foregoing final assessment to the Circuit Court of Montgomery County, in Equity. In the Circuit Court of Montgomery County, in Equity, Plantation Pipe Line Company filed its bill of complaint to which the State filed a demurrer. The court entered a decree in which the court sustained the demurrer to certain aspects of the bill of complaint which are now not under consideration and at the same time overruled the demurrer to other aspects of the bill. The aspects of the bill of complaint to which the demurrers were overruled are stated in the decree to be:

"(3) That the demurrers to that aspect of the bill which seeks to recover the franchise tax of $22655.00 paid to the Department of Revenue for the year 1952 be and are hereby overruled.

"(4) That the demurrers to that aspect of the bill which seek to recover interest on the franchise tax be and the same are overruled.

"(5) That the demurrers to all other aspects of the bill not specifically enumerated herein be and the same are overruled."

Thereafter the State filed its answer to the foregoing bill of complaint. Attached to the answer of appellant were exhibits A, B and C, which were made a part of the answer. These exhibits were introduced in evidence as a part of the record through a stipulation wherein it was agreed that such documentary evidence could be introduced without objection as to form.

On a hearing of the issues made by the bill of complaint and the answer the court rendered its final decree and in doing so made certain findings of fact and conclusions of law. In substance the court declared the final assessment of franchise tax made against Plantation Pipe Line Company for the tax year 1952, was invalid in its entirety and ordered the Comptroller of the State of Alabama to refund to Plantation Pipe Line Company the amount of $22,655 which the company had paid for the sake of taking the appeal as provided in § 140, Title 51, Code of 1940, together with interest on the aforesaid amount from December 12, 1952, and ordered the costs to be paid by the appellant.

In its answer the State pleaded, among other things, res adjudicata to the bill, which was made a part of the answer. The State attached as Exhibit "B" a copy of the bill of complaint which Plantation Pipe Line Company had filed in Case No. 13040 in the Circuit Court of Montgomery County, in Equity, setting up, in substance a cause of action claimed to be identical in all respects with the cause of action here involved, except that the tax involved was for the year 1942. In that case the court held that Plantation Pipe Line Company was due to pay the State of Alabama the sum of $7,849.73 as franchise tax for the year 1942. We shall consider the issue of res adjudicata separately from the other matters considered in this opinion and shall hereinafter outline the contention as to res adjudicata at greater length.

The case was tried orally before the court and we have given careful consideration to the evidence introduced in the cause. We find that the facts as summarized by the court in its decree are substantially in accordance with the facts introduced in evidence and will be stated by us as briefly as possible as follows.

Plantation Pipe Line Company is a corporation which was organized under the laws of the State of Delaware on July 8, 1940. On July 30, 1941, 55 Stat. 610, Congress enacted a law which provides in part, "Whenever the President finds that the construction of any pipe line for the transportation and/or distribution of petroleum or petroleum products moving in interstate commerce, or the extension or completion of any such pipe line already wholly or partly constructed, is or may be necessary for national-defense purposes, he shall by proclamation declare such finding." Section 2. The President, on August 23, 1941, issued a Proclamation, No. 2505, 55 Stat. 1670, to that effect, as to the pipe line proposed to be constructed by Plantation Pipe Line Company, which contained among other things the statement that the President does "hereby find and proclaim (1) that it is necessary for national defense purposes that there be constructed and completed a pipe line system for the transportation and distribution of petroleum and petroleum products moving in interstate commerce, * * * commencing in the vicinity of Baton Rouge, Louisiana, and extending in a north-easterly direction through the States of Louisiana, Mississippi, Alabama, Georgia, and South Carolina, and into North Carolina to a point in the vicinity of Greensboro, North Carolina, with branch lines extending to Montgomery and Birmingham, Alabama, Columbus and Macon, Georgia, and Chattanooga and Knoxville, Tennessee, (2) that Plantation Pipe Line Company, a private corporation organized under the laws of the State of Delaware, has commenced the work necessary for the construction of such a pipe line system and represents that it is prepared to undertake the construction of and will complete said pipe line system * * *."

The pipe line as originally contemplated and as described by the President of the United States in his proclamation was completed and put into operation during the year 1942. The pipe line could not have been financed, organized and the project completed and put into operation except by means of a corporation organized for that purpose and having the customary charter powers, such as the right to issue securities to represent the investment, continuity of existence, etc.

Plantation Pipe Line Company qualified to do business in Alabama in 1941.

Plantation Pipe Line Company was in 1952 and at all times has been a common carrier pipe line company within the meaning of the Interstate Commerce Act, operating solely under tariffs filed with the Interstate Commerce Commission.

Plantation Pipe Line Company has never filed nor sought approval of its rates and tariffs by the State of Alabama or any other state and the State of Alabama has never asserted any regulatory authority or jurisdiction over any of the rates or practices of the Plantation Pipe Line Company.

During the year 1952 Plantation Pipe Line Company owned and operated a pipe line running from Baton Rouge, Louisiana, to Greensboro, North Carolina, with lateral lines from Helena, Alabama, to Birmingham and Montgomery, Alabama, and from Bremen, Georgia, to Columbus and Macon, Georgia, and to Chattanooga and Knoxville, Tennessee. The length of the lines, with laterals, was approximately 1,968 miles, of which approximately 483 miles were located in Alabama. The total investment in carrier property, including construction work in progress as of January 1, 1952, was approximately $69,615,442.47 for the entire system and within the State of Alabama on the same date was approximately $17,095,-063.34.

The business of Plantation Pipe Line Company is and was in 1952 conducted as follows. It receives at Baton Rouge, Louisiana, in tanks owned by it, gasoline and petroleum oil distillate for transmission to terminals, located in other states specified in its tariff. The capacity of its line has been at all times since its construction and was during 1952 and is now absorbed by shipments tendered at Baton Rouge. Plan-

tation Pipe Line Company has never received in Alabama any petroleum products for shipment and has never maintained any facilities in Alabama for receiving such products for shipment. The products received at Baton Rouge are tendered by various shippers and differ in kind and specifications. From the tanks the products are pumped into its pipe line in lots or batches of sufficient volume to remain separate and distinguishable from preceding or succeeding lots. These basic requirements of the business are reflected in tariff I. C. C. No. 14 under which Plantation Pipe Line Company was doing business on January 1, 1952.

After the products are pumped into the pipe line at Baton Rouge, the flow gradually slows down as the product moves, requiring the use of pumps located at intervals to maintain the flow. Three pumping stations were operated in Alabama in 1952 with stand-by facilities at four points in the State of Alabama.

Plantation Pipe Line Company had four delivery terminals in Alabama in 1952, at Moundville, Birmingham, Montgomery and Oxford. It did not make delivery of any products shipped through its pipe line at any point in Alabama other than at these terminals. This was in conformity with its tariff. Plantation did not maintain any storage tanks at any delivery terminal or elsewhere in Alabama. As required by the tariff, shippers receive their products from the pipe line without delay.

The pipe line through Alabama consists of an 18-inch pipe line and a 12-inch pipe line. The line from Helena to Birmingham is an 8-inch line and the line from Helena to Montgomery is a 4-inch line. Due to the difference in size between the main pipe line passing through Helena and the branch lines to Birmingham and Montgomery, it is impossible to take the product directly from either main line into the branch lines. Accordingly, Plantation Pipe Line Company maintains at Helena seventeen tanks into which are diverted the products from the main lines destined for the terminals at

Birmingham and Montgomery. This number of tanks is necessary to insure that the identity of the products being transported be maintained. From the tanks at Helena the product is pumped into the pipe line to Birmingham or Montgomery at high pressure.

Quantities of products destined for Birmingham and Montgomery are not sufficient to require or permit the constant use of the branch lines and therefore the Birmingham and Montgomery delivery terminals are not always open, the products remaining in the tanks at Helena for an average of two or three days before continuing to final destinations. Products are never stored at Helena at the request of a shipper and no deliveries are made there. These tanks are not used for storage and reshipment but are in fact only necessary parts of the transportation facilities without which the deliveries of products received in Louisiana could not be made to the tariff destinations. The tanks at Helena are used in the same way as railroad classification or marshalling yards and the products in the tanks are at all times considered to be and are in fact still in the course of interstate transportation. The tariff does not provide for in transit storage.

In order to assure uninterrupted operation of the pipe line, it is necessary that the person in charge of each pumping station and stand-by facility be on duty or on call at all times and for, this purpose the company maintains at each station one house which it requires the responsible employee to occupy and for which he is charged rent in an amount less than the annual depreciation and repairs.

At each of the operating pumping stations there is a water tank primarily for fire protection. Water from the tank is never sold commercially but is used, incidentally and without charge, by employees at the pumping station and in the company house.

The company maintains at Helena a warehouse where are stored maintenance ma-

terials for the operation of the pipe line. It also maintains a fire truck at Helena.

Plantation Pipe Line Company had 82 employees in Alabama on January 1, 1952, and 68 on January 1, 1953. The only employees in Alabama in 1952 were those engaged solely and directly in the service of constructing, maintaining and operating the pipe line. The company had three trucks at Akron and a truck at Helena and Silver Run in 1952, which were used only to carry employees from place to place in connection with their work in the construction, maintenance and operation of the pipe line, to carry needed supplies and for other purposes directly connected with the construction, maintenance and operation of the pipe line.

Some construction was carried on in 1952 by an independent contractor, consisting of enlarging the pumping facilities on the main lines. Similar work was done at Helena in 1951 and some clean-up work in connection with such construction was done at Helena in 1952.

To keep its pipe line system in operation Plantation Pipe Line Company maintained by means of lines leased from others a communications system between its terminals, pumping stations, and its chief operating office in Atlanta. Plantation Pipe Line Company has never maintained any general or corporate office in Alabama. Its statutory domicile is and has been Delaware and its principal corporate and operating office is and has been in Atlanta, Georgia. Plantation Pipe Line Company has never kept any records in Alabama except pumping station and terminal operating records necessary to the transportation of products received into the pipe line in Louisiana. It has never performed any functions in Alabama except those of constructing, maintaining and operating the pipe line.

All of the business, activities and operations of the Plantation Pipe Line Company in Alabama are carried on solely in furtherance of and are inherent, integral and necessary parts of the interstate transportation of petroleum products. All of the property of Plantation Pipe Line Company located in Alabama, both real and personal, is committed to and used solely in said interstate business. Plantation does not, and did not in 1952, engage in any local or intrastate business or activity whatsoever in Alabama.

Plantation Pipe Line Company has paid all ad valorem taxes assessed by proper state authority on its property located in Alabama, income taxes to the State of Alabama on its net income allocated to the interstate business done by Plantation Pipe Line Company in Alabama and unemployment compensation taxes with respect to its employees in Alabama. Prior to 1952, Plantation Pipe Line Company had paid into the State of Alabama ad valorem taxes aggregating $384,866.74; income taxes aggregating $144,466.06 and unemployment compensation taxes aggregating $26,653.88. For the year 1952, it paid ad valorem taxes of $97,219.36; income taxes of $19,408.59, and unemployment compensation taxes of $1,268.55.

On January 7, 1952, Plantation Pipe Line Company made application for a permit and paid, under protest, to the State Department of Revenue a permit fee for the year 1952 in the amount of $100, disclaiming any desire for a permit to do or any intent to do any business in Alabama except that of interstate commerce.

Plantation Pipe Line Company duly filed on forms prescribed by the State Department of Revenue a franchise tax return for the year 1952, stating on the face of the return that the kind of business conducted in Alabama was interstate transportation by pipe line of products refined from petroleum and disclaiming the transaction of or any intention of transacting any local or intrastate business in Alabama. After hearing protests on behalf of Plantation Pipe Line Company against the assessment of any franchise tax for the year 1952, a final assessment in the amount of $22,655

was made by the State Department of Revenue on November 21, 1952.

The trial court made no findings of fact with reference to the issue of res adjudicata raised by the State. As was said, this matter will be separately considered later in this opinion.

The questions involved in this case may be stated as follows: (1) Was Plantation Pipe Line Company engaged solely in interstate commerce in Alabama in 1952? (2) Assuming that the first question is answered in the affirmative, does the Alabama Foreign Corporation Franchise Tax purport to levy a tax on a foreign corporation engaged solely in interstate commerce in Alabama? (3) Is the Alabama Franchise Tax as here imposed unconstitutional as violative of the Interstate Commerce Clause of the United States Constitution, art. 1, § 8, cl. 3? (4) Are the proceedings with respect to the 1942 Franchise Tax res adjudicata on the issue in this case? The court held the answer to question one to be in the affirmative, to question two in the negative, to question three in the affirmative and the answer to question four to be in the negative.

■ I. Was Plantation Pipe Line Company engaged exclusively in interstate commerce in Alabama in 1952? With respect to this issue the lower court concluded:

"Plantation was engaged solely in interstate commerce in Alabama in 1952. Interstate commerce cannot be conducted in a vacuum without tangible property, personnel, or incidental activities within the boundaries of a state. All activities of Plantation in Alabama were necessary and integral parts of its interstate business and cannot realistically be separated from it."

Taking the undisputed facts in the case, we consider that the court correctly held that Plantation was engaged exclusively in interstate commerce in Alabama in 1952.

In Spector Motor Service, Inc., v. O'Connor, 340 U.S. 602, 71 S.Ct. 508, 95 L.Ed. 573, the Supreme Court of the United States held Spector was engaged exclusively in interstate commerce in Connecticut. The facts upon which this conclusion was based were clearly stated by the Supreme Court of Connecticut in Spector Motor Service, Inc., v. Walsh, 135 Conn. 37, 61 A.2d 89, as follows:

"The finding of the trial court and the exhibits made a part of it present the following situation. The plaintiff is a Missouri corporation. It originally had its principal place of business in St. Louis but later moved to Chicago. Its business, during the period involved in this action, was exclusively the transportation of freight in interstate commerce as a common carrier. Originally, it carried freight only from St. Louis to New York, but, in order to secure the advantages of a two-way haul, it set up facilities to obtain goods for shipment from the east to the west and, in particular, shipment of less than full truck loads. In addition to its terminals in St. Louis and New York, it set up terminals in Chicago, in New Britain and Bridgeport, Connecticut, and in cities in Massachusetts, Rhode Island and New Jersey. Where a full truck load is to be shipped to or from any customer in Connecticut, trucks making the long haul go directly to the customer's place of business. In case of smaller shipments, the freight is taken from the customer's place of business by pickup trucks to the terminal, where it is transshipped to the long-haul trucks. The pickup trucks merely act as a part of the interstate transportation of the freight. The business of the company as outlined above was established prior to the enactment by the Congress of the Motor Carrier Act, 1935, 49 Stat. 543, 49 U.S.C. § 301 et seq. (1940), 49 U.S.C.A. § 301 et seq., it carried on its business thereafter under a provision in that act allowing it to continue to

operate as it was doing on June 1, 1935, until in February, 1942, it received a permit from the interstate commerce commission. Of its total business during the years 1936 to 1940, the following portions originated in, was attributable to or was derived from this state: 1936, 47 per cent of a total business of $233,787.78; 1927 [sic.], 37.86 per cent of a total business of $440,025.92; first five months of 1938, 47 per cent of a total business of $318,786.85; last seven months of 1938, 50 per cent of a total business of $432,087.39; 1939, 42 per cent of a total business of $1,202,210.35; 1940, 34 per cent of a total business of $1,723,510.65.

"The plaintiff uses in the operation of its business about 85 trucks or tractors and 115 trailers. Most of these are leased from the Wallace Transport Company. This is a corporation organized by officers of the plaintiff; the plaintiff furnished the money to purchase the vehicles; and all the capital stock of the Transport Company is owned by the same four persons who own all the stock of the plaintiff, that is, its two principal officers and their wives. The Transport Company was organized under the laws of Illinois for the purpose of securing certain advantages in reciprocity agreements between that state and other states and to avoid certain taxes which would otherwise be imposed upon it by states through which it carries freight. All the drivers of the trucks are employees of and are paid by the plaintiff. Several of the pickup trucks are registered with the motor vehicle department of Connecticut in the name of the plaintiff, and during the years involved in this action it obtained permits to purchase tires from the rationing board at New Britain for its commercial vehicles registered in this state. It leases its terminals at New Britain and Bridgeport. It owns personal property in Connecticut consisting of office equipment valued at $1500 to $2000, upon which it pays property taxes in New Britain. It has a bank account in Bridgeport for the deposit of cash payments made by shippers, but no one in this state has authority to draw upon it; all checks received in this state are sent to Chicago and cash received at New Britain is converted into bank drafts and sent to Chicago; and, except for a small amount of cash kept at New Britain to pay incidental expenses, all expenses and wages of employees are paid by draft on the plaintiff at Chicago. The plaintiff employed ten persons at Bridgeport and seventeen persons at New Britain; of these, five persons, employed two or three at a time, were engaged in soliciting business, straightening out complaints and generally promoting the plaintiff's business.

"In connection with the leasing of its terminal at New Britain, the landlord insisted that the plaintiff qualify in Connecticut as a foreign corporation and name the secretary of the state as its agent for service so that it would be subject to the jurisdiction of our courts in the event that litigation should arise out of the lease; the plaintiff did so qualify on May 5, 1934; this was apparently done under § 3489 of the General Statutes, which provides that every foreign corporation having an office or place of business in this state shall, before entering upon such business, appoint the secretary of the state its attorney for the service of process; but the plaintiff never otherwise applied for or received authority to do business in this state, and its business is limited entirely to interstate commerce as specified by permits from the Connecticut public utilities commission. In accordance with the requirement of the Motor Carrier Act, 1935, 49 Stat. 564, 49 U.S.C. § 321(c) (1940), 49 U.S.C.A. § 321(c), it also designated a person in New Haven upon whom process might be served."—61 A.2d at pages 93, 94.

It is obvious from this statement of the Connecticut Court that the activities of Spector in Connecticut were substantially similar to the activities of Plantation in Alabama in 1952. Spector was a common carrier of freight in interstate commerce. Plantation is a common carrier of petroleum products in interstate commerce. Spector had employees in Connecticut, some of whom solicited business, straightened out complaints and in general promoted the plaintiff's business. Plantation had employees in Alabama who were engaged solely in the construction, maintenance and operation of its pipe line. Spector had two terminals in Connecticut at which goods destined for Connecticut consignees were unloaded from large trucks for further transportation by smaller pickup trucks or at which goods to be shipped out of the state were brought by pickup trucks so that they could be loaded into large trucks. The products carried by Plantation are delivered direct to the shipper by Plantation at delivery terminals in Alabama. Spector used pickup trucks registered in its own name with the Motor Vehicle Department of Connecticut. Plantation used trucks with Alabama license tags for purposes directly connected with the construction, maintenance and operation of its pipe line. Spector had to maintain its facilities and equipment in Connecticut. Plantation had to maintain its pipe line in Alabama. Spector received goods for shipment in Connecticut. Plantation did not receive in Alabama any products for shipment.

As we understand the situation the State insists that the operation of the lateral lines from Helena to Birmingham and Montgomery is not interstate commerce. This overlooks the indisputable fact that the product moving in such lines is received by Plantation at Baton Rouge, Louisiana, for transportation to Birmingham and Montgomery as tariff destinations, and that such lines are an integral part of its interstate transportation system. Spector maintained two terminals in Connecticut where goods were brought from out of the state in large trucks. The goods were unloaded

from such large trucks at the terminal and then placed on smaller trucks for delivery to the ultimate consignee but this was held to be merely a necessary and incidental part of the interstate delivery and not intrastate commerce. It certainly appears that Plantation's use of smaller lines to deliver products received by it in Baton Rouge, Louisiana, is no less incidental and necessary to the completion of its interstate delivery.

In Ozark Pipe Line Corporation v. Monier, 1925, 266 U.S. 555, 45 S.Ct. 184, 69 L.Ed. 439, the activities of the corporation in Missouri were described by the court substantially as follows. Ozark Pipe Line Corporation was a Maryland corporation which owned and operated a pipe line extending from within Oklahoma through Missouri to points in Illinois, with certain lines in Oklahoma. Through this line crude petroleum was conducted to Illinois and there delivered. Oil was neither received nor delivered within the State of Missouri. Since it began its operation it had been assessed and had paid general property taxes upon that portion of its line and upon its other assets in Missouri. It maintained its principal office in Missouri where it kept its books and bank accounts from which it paid its employees within and without the State, purchased supplies, employed labor, maintained telephone and telegraph lines, entered into contracts for transportation of crude oil and carried on various other activities connected with and in furtherance of its pipe line operation. Along the pipe line in Missouri there were three pumping stations, the sole use of which was to accelerate the passage of oil through the line. It owned and operated passenger and truck automobiles but these, as well as its other property in Missouri, were used exclusively in prosecution of its interstate business. In compliance with the Laws of Missouri, applicable to corporations formed in other states desirous of transacting business in Missouri, it filed with the Secretary of the State its articles of incorporation and amended articles, paid license taxes and obtained a license and authority to engage " 'exclusively in the business of transport-

ing crude petroleum by pipe line.'" 266 U.S. at page 561, 45 S.Ct. at page 185, 69 L.Ed. at page 441. It thereby acquired the right of eminent domain under the Laws of Missouri. Missouri sought to impose a franchise tax "upon the privilege or right to do business". 266 U.S. 562, 45 S.Ct. 185, 69 L.Ed. 442. It was held that Ozark was engaged solely in interstate commerce.

The facts of the Ozark case and the facts of the instant case are similar in that in the state which sought to impose the tax both companies owned and operated a pipe line, both had pumping stations to accelerate the passage of the product through the line, both carried essentially the same product, both employed labor and maintained communications facilities in connection with the operation of the pipe line, both owned and operated trucks which were used exclusively in prosecution of its interstate business, both paid the ad valorem taxes assessed by the taxing authorities and both were qualified to do business in the state in which the tax was sought to be imposed.

A study of the difference in the facts between the Ozark case and the facts in the case at bar is worthwhile. Ozark maintained in Missouri its principal office where it kept its books and bank accounts from which it paid its employees within and without Missouri. Plantation maintained its principal office at Atlanta, Georgia, and kept no books or records in Alabama except such as were necessary to the transportation and delivery of products in Alabama. Ozark entered into contracts for the transportation of products in Missouri. Plantation did not enter into any contracts in Alabama for the transportation of products. It seems to us conclusive that if Ozark was engaged exclusively in interstate commerce in Missouri under the facts outlined above, and it was so held by the Supreme Court of the United States, then Plantation necessarily was engaged exclusively in interstate commerce in Alabama in 1952.

In United Air Lines, Inc. v. Joseph, 282 App.Div. 48, 121 N.Y.S.2d 692, affirmed 307 N.Y. 762, 121 N.E.2d 557, United Air Lines operated in many states from coast to coast and even beyond the continental boundaries of the United States. Its main and financial office was in Illinois, its chief maintenance base in Wyoming. It carried air mail, passengers and freight in interstate and foreign commerce. It carried no intrastate traffic in New York. The sale of passenger tickets in New York City averaged over $2,000,000 each year. It was estimated that an equal amount was sold outside the city for transportation into the city. It operated in New York City the usual facilities including three traffic offices, a hangar, a stock room of parts and supplies and a repair and maintenance shop. It employed about 300 persons in New York City including a district traffic manager.

It was contended that the vast business establishment of the United Air Lines within the city as has been described, "the depositing and checking out of moneys in local banks, the handling of baggage and the conveniences of passengers at the terminal, * * * constitute such a separation, distinction and localizing of its generally interstate operations as to subject" United Air Lines to a tax by the city on its gross receipts.

In holding that the United Air Lines was engaged solely in interstate commerce in New York the court held:

"* * * We think the activities of United Air in New York City are simply a continuous, logical and necessary extension of its interstate air transportation, and that, therefore, the tax imposed here is a local tax on interstate commerce, forbidden by the Federal Constitution. The size of its activities in New York City is but a reflection of the size of United Air's interstate operations and the importance of New York City as a land, sea and air center of transportation. In any event, mere size of operations is immaterial if, in fact, the operations

are solely in interstate or foreign commerce. Also, it has never been held that merely because an interstate transaction stops or starts in a state, that the stop or start is localized or intrastate; nor does the city claim that.

" * * * all the matters that the city contends localize United Air's activities are nothing more than the necessary incidents to operating a terminal point for its interstate transportation to and from New York City. The presence of offices, hangar, repair shops, employees, and the handling of moneys locally are all a direct part of the interstate operation. The sale of tickets for interstate trips is obviously a necessary incident. Indeed, but for these incidents there could be no interstate transportation by United Air. One transports for hire, therefore one is paid. The passenger must get a ticket or other evidence of paid passage. The aircraft must be loaded. It must be discharged. These acts must take place somewhere. These are as essential to commercial air transport as the aircraft itself, or the route to be traversed. As Mr. Justice Cardozo said on behalf of the Supreme Court in the Puget Sound Co. case [Puget Sound Stevedoring Co. v. Tax Comm.], 302 U.S. 90, 92, 58 S.Ct. 72, at page 73 [82 L.Ed. 68], supra, speaking of independent stevedore activities done entirely within the state of Washington, but holding them to be interstate in character:

" 'Transportation of a cargo by water is impossible or futile unless the thing to be transported is put aboard the ship and taken off at destination. A stevedore who in person or by servants does work so indispensible is as much an agency of commerce as shipowner or master. * * * No one would deny that the crew would be engaged in interstate or foreign commerce if busied in loading or unloading an interstate or foreign vessel. * * *

" 'What was done by this appellant in the business of loading and unloading was not prolonged beyond the stage of transportation and its reasonable incidents.'

"The holding and the reasoning in the Puget Sound Co. case was later reaffirmed in Joseph v. Carter & Weekes Co., 330 U.S. 422, 67 S.Ct. 815, 91 L.Ed. 993, supra. Since it involved stevedore operations by an independent contractor, its holding and reasoning go well beyond the necessities of this case.

"The Spector case, mentioned earlier several times, is of course even more applicable to the problem here. There the taxpayer maintained offices, employees and pick-up trucks in the taxing state. Nevertheless, it was held that the state could not tax the gross receipts because they were derived from interstate truck transportation." 121 N.Y.S.2d at pages 695, 699, 700.

It is well to observe that United maintained in New York City stock rooms of parts or supplies and a repair and maintenance shop, and it was held that those aspects of its business could not be "localized" and disassociated from its interstate operations. So in the present case, the existence of a warehouse at Helena where there are stored goods necessary for the operation of the pumping and other transportation facilities located there does not change the fact that Plantation is engaged solely in interstate commerce in Alabama.

The State emphasizes the fact that Plantation owned at each pumping station and stand-by facility a house which was rented, for less than the amount of depreciation and repairs, to the person in charge of the facility who was required to be on duty or on call for duty twenty-four hours a day. In Texas Gas Transmission Corp. v. Atkins, 197 Tenn. 123, 270 S.W.2d 384, Texas Gas had in Tennessee compressor stations, meter men and dispatchers, maintenance camps, materials and supplies,

rights of way, easements and permits to cross highways, etc., and all other facilities necessary for the operation of a gas pipe line. Yet it was held to be engaged solely in interstate commerce in Tennessee. It certainly follows that if the presence of maintenance camps in Tennessee was not held to be doing a local or intrastate business, the ownership of one house by Plantation at each pumping and stand-by facility could not be so held.

The State also emphasizes that there were tank facilities at Helena. The seventeen tanks at Helena are integral parts of the transportation system. They are necessary to insure that the identity of the products being transported to Birmingham and Montgomery will be maintained. Quantities of products destined for Birmingham and Montgomery are not sufficient to require the constant use of the lines to those two terminals and, therefore, such terminals are not always open. Products which are destined for either Birmingham or Montgomery stay in the tanks at Helena for an average of two or three days before being placed in the branch pipe line to either of these delivery terminals. While the shipments are held at Helena they are still in the course of interstate transportation. The shipments are never stored at Helena at the request of a shipper. So we point to the recent opinion of the Supreme Court of Illinois in Mississippi River Fuel Corp. v. Hoffman, 4 Ill.2d 468, 123 N.E.2d 503, 505, certiorari denied Wright v. Mississippi River Fuel Corp., 349 U.S. 935, 75 S.Ct. 785, 99 L.Ed. 651, wherein the court said:

"Appellants devote a considerable part of their argument to a discussion of an attempt which is being made by appellee to create a gas storage field in Illinois in an exhausted gas field in Monroe County. It is enough to say that even if appellee had fully succeeded in this endeavor and if some of the gas sold to its industrial customers had for a time been held in storage in the places mentioned, it would not, in our opinion, detract in any way from the interstate character of the whole transaction. A freight train carrying an interstate shipment may pause for a long time at a railroad siding in the course of the shipment without changing the interstate character of the whole act. It is well known, at least to those acquainted with the natural gas pipeline industry, that in several parts of the country such gas storage fields exist, and it has never been supposed that the existence and use of this method of underground storage has in any way detracted from or minimized the interstate character of the business of such pipeline companies.

\*　\*　\*　\*　\*　\*

"The same considerations apply to appellants' argument that appellee's business is in some way reduced to a local intrastate one by reason of the fact that appellee sometimes finds it advisable to 'pack' gas in its pipelines at higher than normal pressure. Such 'packing' is treated by appellants as identical with 'storage.' What we have said above with respect to underground storage of gas as a proper and useful part of interstate commerce disposes of this question of 'packing.' "

Far more mechanically necessary than the gas storage fields referred to in the foregoing authority, the Helena tanks are essential parts of the transportation facilities required by the special and highly developed technique of pipe line transmission. They are in no sense merely optional storage facilities. The interstate transportation could not take place without them any more than railroad freight could be handled without classification yards and side tracks.

Even in the situation where gasoline is brought into a state by truck or rail and put into storage tanks pending further distribution to ultimate consumers in a regular "flow of trade," interstate commerce is not interrupted. Standard Oil Co. v. Federal

Trade Commission, 340 U.S. 231, 238, 71 S.Ct. 240, 95 L.Ed. 239, 245.

It cannot be asserted that interstate commerce, to be immune from taxation, must be conducted in some sort of vacuum without tangible property, personnel or incidental activities within the boundaries of the state. The fallacies of such contention was demonstrated in Ozark Pipe Line Corporation, supra, where the Court said:

"The maintenance of an office, the purchase of supplies, employment of labor, maintenance and operation of telephone and telegraph lines and automobiles, and appellant's other acts within the state, were all exclusively in furtherance of its interstate business, and the property itself, however extensive or of whatever character, was likewise devoted only to that end. They were the means and instrumentalities by which that business was done and in no proper sense constituted, or contributed to, the doing of a local business. The protection against imposition of burdens upon interstate commerce is practical and substantial and extends to whatever is necessary to the complete enjoyment of the right protected. Heyman v. Hays, supra, [236 U.S. 178, at] page 266 U.S. at page 565, 45 S.Ct. at page 186 (35 S.Ct. 403, [59 L.Ed. 527, 531])." 186, 69 L.Ed. at page 443.

A consideration of the foregoing authorities causes us to reach the conclusion that Plantation was engaged exclusively in interstate commerce in Alabama in 1952.

■ II. The Alabama franchise tax on foreign corporations is not applicable to foreign corporations doing an exclusively interstate business in Alabama. In Anglo-Chilean Nitrate Sales Corp. v. State of Alabama, 288 U.S. 218, 53 S.Ct. 373, 374, 77 L.Ed. 710, the court held that the Alabama franchise tax on foreign corporations is laid upon the actual doing of business and "not upon the authorization, right, or privilege to do business in Alabama".

It will be recalled that a permit to do business in Alabama was issued by the state authorities under protest of Plantation on the ground that it was engaged in doing an exclusively interstate business in Alabama.

A study of the history of the franchise tax, including amendments made after the Anglo-Chilean decision, supra, and the constitutional provision under which it was levied and the decisions of this court demonstrate to us that the franchise tax on foreign corporations is only applicable to foreign corporations actually doing an intrastate business in this State.

Article XIV, Section 4, of the Constitution of 1875 provided:

"No foreign corporation shall do any business in this state without having at least one known place of business and an authorized agent or agents therein; and such corporation may be sued in any county where it does business by service of process upon an agent anywhere in this state."

■ Article 12, Section 232, of the Constitution of 1901 provides:

"No foreign corporation shall do any business in this state without having at least one known place of business and an authorized agent or agents therein, and without filing with the secretary of state a certified copy of its articles of incorporation or association. Such corporation may be sued in any county where it does business, by service of process upon an agent anywhere in the state. The legislature shall, by general law, provide for the payment to the State of Alabama of a franchise tax by such corporation, but such franchise tax shall be based on the actual amount of capital employed in this state. Strictly benevolent, educational, or religious corporations shall not be required to pay such a tax."

These sections relate to a foreign corporation that "does business" in Alabama or to foreign corporations that "do any

84

business in this state". The decisions of this Court hold that these words are construed as holding that a foreign corporation doing an exclusively interstate business in Alabama does not "do any business in this state" and that the constitutional provision is not applicable to such a corporation. Ware v. Hamilton Brown Shoe Co., 92 Ala. 145, 9 So. 136; Nelms v. Edinburg-American Land Mortgage Co., 92 Ala. 157, 9 So. 141; Hurst v. Fitz Water Wheel Co., 197 Ala. 10, 72 So. 314; Puffer Mfg. Co. v. Kelly, 198 Ala. 131, 73 So. 403; Cobb v. York Ice Machine Corp., 230 Ala. 95, 159 So. 811 and Ewart Lumber Co. v. American Cement Plaster Co., 9 Ala.App. 152, 62 So. 560. This Court well stated the rule in the Hurst case supra, when it said, "The constitutional and statutory provisions under consideration were not intended and cannot be made to interfere with, or to apply to, interstate commerce."

The Constitution of 1901 provides for the payment of a franchise tax by "such corporation." The words "such corporation" can only apply to foreign corporations that "do any business in this state" or to a foreign corporation that "does business" in Alabama. As previously shown, these words do not apply to a foreign corporation doing exclusively an interstate business in Alabama.

In 1907 the legislature levied, Act No. 334, General Acts of 1907, p. 418, a franchise tax on "every foreign corporation authorized to do business in this State under the laws of the State of Alabama, except strictly benevolent, educational or religious corporations". After the 1907 Act was declared unconstitutional in Southern Railway Co. v. Greene, 216 U.S. 400, 30 S.Ct. 287, 54 L.Ed. 536, the legislature enacted the forerunner of our present franchise tax law, Section 12 of Act No. 216, Acts of 1911, p. 170. As for domestic corporations the Act provided for a franchise tax on "All corporations organized under the laws of this State". As for foreign corporations the Act provided for a franchise tax on "All corporations

organized under the laws of any other State, nation or territory, and doing business in this State". While the language of the franchise tax statute has changed some since 1911, the quoted words have always been contained in each statute. Since 1911 the enactment of the foreign franchise tax "implementing [State v. Travelers Ins. Co., 256 Ala. 61, 53 So.2d 745, 746] this constitutional provision" has been "In conformity to the mandate of the Constitution", State v. Jackson Securities & Inv. Co., 243 Ala. 83, 8 So.2d 573, and "in the words of the Constitution, indicating the purpose of the Legislature to make the statutory levy conform with the Constitution." International Paper Co. v. Curry, 243 Ala. 228, 9 So.2d 8, 11. The words "doing business in this State" as used in the franchise tax cannot have any different meaning from the words "do any business" or "does business" in the Constitution.

Before the enactment of any franchise tax in Alabama this Court held that a license tax "for 'doing business as a corporation'" was a tax for "'doing business as a corporation,' and not for the mere privilege of existing as a corporation." State v. Anniston Rolling Mills, 125 Ala. 121, 27 So. 921. This decision establishes a basic distinction. The Court distinguished between a tax on the privilege of using the corporate form and a tax on the actual doing of business and held that a tax imposed on "'doing business as a corporation'" was a tax on the actual doing of business and not merely on the corporate privilege.

The question now under discussion came before this Court in State v. National Cash Credit Association, 224 Ala. 629, 141 So. 541, 545, where the taxpayer argued in brief that,

"In order for a foreign corporation to be liable for a franchise tax in Alabama, it must both be doing business and employing capital within the state. These prerequisites must exist concurrently, and, in the absence of either, the power to impose the tax does not

exist. * * * Mere qualifications by a foreign corporation to do business in Alabama does not constitute doing business within the state."

In response to this argument this Court on rehearing held:

"We merely hold a franchise tax to be what it purports to be, a tax upon the exercise or use of its franchise in Alabama for the purposes of such franchise."

This is an express holding that the Alabama franchise tax on foreign corporations is only applicable when the foreign corporation is doing business in Alabama. The holding of the United States Supreme Court in the Anglo-Chilean case, supra, is in harmony with the decision of this Court in the National Cash Credit Association case, supra. The United States Supreme Court held that the Anglo-Chilean Nitrate Sales Corporation was engaged solely in interstate commerce in Alabama and that therefore the Alabama foreign corporation franchise tax was not applicable to such corporation, even though it had qualified to do business in Alabama.

In State v. Southern Natural Gas Corporation, 233 Ala. 81, 170 So. 178, 190, this Court again reviewed the Alabama franchise tax as it existed prior to the 1935 amendment, General Acts 1935, p. 388. After considerable discussion it was said, "We hold that the franchise tax here exacted and being considered is * * * laid on the exercise of corporate functions, or on the privilege of exercising corporate functions within the state". The Court held that Southern Natural was doing an intrastate business in Alabama and was therefore liable for the tax. If the tax had been laid merely on the right of a foreign corporation to exercise its functions solely within the State of Alabama or the right to do business in Alabama in corporate form, the Court could have held the tax applicable without considering or deciding the question of whether or not the company was doing an intrastate business since

Southern Natural had qualified in Alabama and thus obtained such rights. The Southern Natural Gas case was affirmed by the United States Supreme Court, 301 U.S. 148, 57 S.Ct. 696, 698, 81 L.Ed. 970, after it found that Southern Natural "carried on in Alabama activities of an intrastate character."

■ After the decision in the Anglo-Chilean case the Alabama legislature in 1935 added Section 318 of Act No. 194, General Acts of 1935, p. 388, containing the following proviso to the foreign corporation franchise tax:

"Provided, that if a corporation has qualified to do business in this State it shall for the purpose of franchise tax prima facie be held to be doing business in the State of Alabama within the meaning of this Act."

This proviso has remained a part of the law ever since. Section 348, Title 51, Code of 1940.

This proviso makes it clear that after 1935 the Alabama franchise tax is not, if it ever was, laid on the bare right of a foreign corporation to exercise its corporate functions within the State of Alabama or the right to do business in Alabama in corporate form. If the tax was applicable to any foreign corporation which had qualified to do business in Alabama, even though the business done was exclusively interstate, there was no need for the proviso, as such a corporation had the right to exercise its corporate function within the State and the right to do business in Alabama in corporate form. In other words, the proviso is an express legislative recognition of the fact that a foreign corporation must be doing some intrastate commerce before the tax is applicable. The Act makes the fact of qualification merely prima facie evidence of such intrastate commerce, recognizing that the bare fact of qualification would not be conclusive. It is clear, therefore, that a corporation engaged exclusively in interstate commerce is not intended to be sub-

ject to the tax. The decisions rendered since the enactment of the proviso also make it clear that a foreign corporation must be doing some intrastate commerce in Alabama before it is subject to the tax. Consolidated Coal Co. v. State, 236 Ala. 489, 183 So. 650.

In Hollingsworth & Whitney Co. v. State, 241 Ala. 96, 1 So.2d 387, 388, the franchise tax as amended was before the Court and this Court said: "The franchise tax is not a condition or qualification to 'doing business'" and "We have often noted that this tax is an excise for the privilege of doing business in Alabama." And analyzing the record further the court continued: "We think that this status shows a doing of business in Alabama, by the taxpayer, so as to subject it to a franchise tax."

We are satisfied that the franchise tax is only applicable to foreign corporations doing intrastate business in Alabama.

III. The Alabama franchise tax if applicable to a foreign corporation engaging exclusively in interstate commerce in Alabama would be unconstitutional. The question here presented is controlled by the recent decision of the Supreme Court of the United States in Spector Motor Service, Inc., v. O'Connor, 340 U.S. 602, 71 S.Ct. 508, 95 L.Ed. 573. In that case the same kind of tax with the same operating incidence as the Alabama tax involved in this case was held invalid. The foregoing decision is the result of lengthy litigation in which the various facts and issues were fully considered. It appears that there were seven decisions rendered before the Supreme Court of the United States finally held that the Connecticut franchise tax contravened the Commerce Clause when applied to a corporation qualified to do business in Connecticut, doing exclusively an interstate business. We cite these decisions because they will add an understanding to the final decision.

The Connecticut Corporation Business Tax of 1935 imposed a tax upon every corporation "carrying on business in this state". Gen.St.Supp. Conn. 1935, § 418c. This act was amended in 1937 so as to impose the tax on every corporation "carrying on, or having the right to carry on, business in this state". Gen.St.Supp. Conn. 1939, § 354e. We refer now to Spector Motor Service, Inc., v. McLaughlin, D.C., 47 F. Supp. 671; Spector Motor Service, Inc., v. Walsh, 2 Cir., 139 F.2d 809; Spector Motor Service, Inc. v. McLaughlin, 323 U.S. 101, 65 S.Ct. 152, 89 L.Ed. 101; Spector Motor Service, Inc. v. Walsh, Tax Commissioner of Conn., 15 Conn.Sup. 205; Spector Motor Service, Inc., v. Walsh, 135 Conn. 37, 61 A.2d 89; Spector Motor Service v. McLaughlin, D.C., 88 F.Supp. 711; Spector Motor Service, Inc., v. O'Connor, 2 Cir., 181 F.2d 150.

This brings us to a consideration of the final decision of the Supreme Court of the United States which granted certiorari "because of the fundamental nature of the issue and the apparent conflict between the judgment below and previous judgments of this Court." 340 U.S. 602, at page 605, 71 S.Ct. 508, at page 510, 95 L.Ed. 573, at page 576. A brief résumé of the basic positions of the various Federal judges who considered the matter will bring into proper perspective the conflict of views presented to the Supreme Court of the United States. On the one hand, Judges Clark and Frank, constituting the majority of the Second Circuit, felt that decisions such as Western Live Stock v. Bureau of Revenue, 303 U.S. 250, 58 S.Ct. 546, 82 L.Ed. 823, Memphis Natural Gas Co. v. Stone, 335 U.S. 80, 68 S.Ct. 1475, 92 L.Ed. 1832 and Interstate Oil Pipeline Co. v. Stone, 337 U.S. 662, 69 S.Ct. 1264, 93 L.Ed. 1613, decisions which are relied upon by the State in this case, indicated a trend toward a holding of constitutionality and a departure from earlier precedents such as Ozark Pipe Line Corp. v. Monier, 266 U.S. 555, 45 S.Ct. 184, 69 L.Ed. 439, and Alpha Portland Cement Co. v. Commonwealth of Massachusetts, 268 U.S. 203, 45 S.Ct. 477, 69 L.Ed. 916. On the other hand, Judges Hand (first appeal)

and Swann of the Circuit Court (second appeal) and Smith of the District Court followed what Judge Hand so aptly called [139 F.2d 822] " 'an unbroken line of decisions' ", which included the Ozark and Alpha Portland cases.

The Supreme Court adopted the interpretation of the Supreme Court of Connecticut as to the incidence of the tax and pointed out that its decision as to the validity of the tax was the same without regard to the amendment. In holding that the tax as applied to Spector Motor Service, which was engaged, according to the Court, exclusively in interstate commerce, contravened the Commerce Clause of the United States Constitution, the Court, speaking through Justice Burton, said:

"The incidence of the tax provides the answer. The courts of Connecticut have held that the tax before us attaches solely to the franchise of petitioner. to do interstate business. The State is not precluded from imposing taxes upon other activities or aspects of this business which, unlike the privilege of doing interstate business, are subject to the sovereign power of the State. Those taxes may be imposed although their payment may come out of the funds derived from petitioner's interstate business, provided the taxes are so imposed that their burden will be reasonably related to the powers of the State and nondiscriminatory.

"This Court heretofore has struck down, under the Commerce Clause, state taxes upon the privilege of carrying on a business that was *exclusively* interstate in character. The constitutional infirmity of such a tax persists no matter how fairly it is apportioned to business done within the state, Alpha Portland Cement Co. v. Commonwealth of Massachusetts, 268 U.S. 203, 45 S.Ct. 477, 68 L.Ed. 916, 44 A.L.R. 1219 (measured by percentages of 'corporate excess' and net income) ; Ozark Pipe Line Corp. v. Monier, 266 U.S. 555, 45 S.Ct. 184, 69 L.Ed. 439 (meas-

ured by percentage of capital stock and surplus). See Interstate Oil Pipe Line Co. v. Stone, 337 U.S. 662, 669 et seq., 69 S.Ct. 1264, 1267, 93 L.Ed. 1613 [1621] (dissenting opinion which discusses the issue on the assumption that the activities were in interstate commerce) ; Joseph v. Carter & Weekes Stevedoring Co., 330 U.S. 442, 67 S.Ct. 815, 91 L.Ed. 993 ; Freeman v. Hewitt [329 U.S. 249, 67 S.Ct. 274, 91 L.Ed. 265], supra.

"Our conclusion is not in conflict with the principle that, where a taxpayer is engaged both in intrastate and interstate commerce, a state may tax the privilege of carrying on intrastate business and, within reasonable limits, may compute the amount of the charge by applying the tax rate to a fair proportion of the taxpayer's business done within the state, including both interstate and intrastate. Interstate Oil Pipe Line Co. v. Stone [337 U.S. 662, 69 S.Ct. 1264, 93 L.Ed. 1613], supra ; International Harvester Co. v. Evatt, 329 U.S. 416, 67 S.Ct. 444, 91 L.Ed. 390 ; * * *. The same is true where the taxpayer's business activity is local in nature, such as the transportation of passengers between points within the same state, although including interstate travel, Central Greyhound Lines [of New York] v. Mealey, 334 U.S. 653, 68 S.Ct. 1260, 92 L.Ed. 1633, or the publication of a newspaper, Western Live Stock v. Bureau of Revenue, 303 U.S. 250, 58 S.Ct. 546, 82 L. Ed. 823, [115 A.L.R. 944]. See also, Memphis Natural Gas Co. v. Stone, 335 U.S. 80, 68 S.Ct. 1475, 92 L.Ed. 1832.

"In this field there is not only reason but long-established precedent for keeping the federal privilege of carrying on exclusively interstate commerce free from state taxation. To do so gives lateral support to one of the cornerstones of our constitutional law.— McCulloch v. Maryland, 4 Wheat.

316, [17 U.S. 316, 4 L.Ed. 579] supra." 340 U.S. at pages 608–610, 71 S.Ct. at page 512, 95 L.Ed. at pages 578, 579.

Justices Clark, Black and Douglas dissented on the ground that a tax even on exclusively interstate commerce is valid when fairly apportioned and nondiscriminatory.

In holding that a tax upon the franchise of a corporation for the privilege of carrying on or doing business was unconstitutional when applied to a qualified foreign corporation engaged exclusively in interstate commerce, the Court followed that "'unbroken line of decisions'", including Ozark Pipe Line Corp. v. Monier, supra, and Alpha Portland Cement Co. v. Commonwealth of Massachusetts, supra, Joseph v. Carter & Weekes Stevedoring Co., 330 U.S. 422, 67 S.Ct. 815, 91 L.Ed. 993, and Freeman v. Hewitt, 329 U.S. 249, 67 S.Ct. 274, 91 L.Ed. 265. The first two of these cases had been considered by a majority of the Second Circuit to be outmoded by recent "trends." However, the Supreme Court reaffirms or, as one commentator (20 Ford L.R. 217 at 218) put it, "explicitly 're-stores to full vigor'" the decisions in Ozark Pipe Line Corp. and Alpha Portland Cement Co., supra.

In an effort not to prolong unreasonably this opinion, attention will be directed to only one of the foregoing cases, namely, Ozark Pipe Line Corp. v. Monier, supra, as the facts of that case closely parallel the facts in the case now before us.

The Supreme Court of the United States in the following manner stated the position of the taxing authorities:

"But the contention in justification of the tax is that appellant is also engaged in doing local business, the basis of such contention being the facts concerning its ownership and use of property, other than the pipe line, and its various acts and activities within the state hereinbefore recited, and, fur-ther, that the purposes for which it is incorporated, as declared in its articles, comprehend other activities than that of transporting petroleum, namely, the acquisition and operation of telegraph and telephone lines, dealing in and transporting merchandise, etc." 266 U.S. at page 562, 45 S.Ct. at page 185, 69 L.Ed. at page 442.

However the Court held that Ozark Pipe Line Corporation was not liable for the tax and said:

"The business actually carried on by appellant was exclusively in interstate commerce. The maintenance of an office, the purchase of supplies, employment of labor, maintenance and operation of telephone and telegraph lines and automobiles, and appellant's other acts within the state, were all exclusively in furtherance of its interstate business, and the property itself, however extensive or of whatever character, was likewise devoted only to that end. They were the means and instrumentalities by which that business was done and in no proper sense constituted, or contributed to, the doing of a local business. The protection against imposition of burdens upon interstate commerce is practical and substantial and extends to whatever is necessary to the complete enjoyment of the right protected. Heyman v. Hays, supra, [236 U.S. 178, at] page 186 (35 S.Ct. 403 [59 L.Ed. 527, 531]). * * *

"Some stress is laid upon the fact that the objects and purposes specified in appellant's articles of incorporation are not confined to the transportation of petroleum but include the doing of other business local in character. As to this, it is enough to say that none of these powers were in fact exercised in the state of Missouri; and so far as this case is concerned the power to tax depends upon what was done and not upon what might have been done. Moreover, the license issued by the

state authorized appellant to engage 'exclusively in the business of transporting crude petroleum by pipe line.'

"Nor is it material that appellant applied for and received a Missouri license or that it had the power thereunder to exercise the right of eminent domain. These facts could not have the effect of conferring upon the state an authority, denied by the federal Constitution, to regulate interstate commerce. The state has no such power even in the case of domestic corporations. See Philadelphia [& Southern Mail] S. S. Co. v. Pennsylvania, 122 U.S. 326, 342, 7 S.Ct. 1118, 30 L.Ed. 1200 [1203]. The statute as applied to appellant is unconstitutional." 266 U.S. at pages 565–567, 45 S.Ct. at pages 186, 187, 69 L.Ed. at pages 443, 444.

The opinion of the Supreme Court in the Spector case clarifies the disparity of views between the Justices that appeared in 1949 in the case of Interstate Oil Pipe Line Co. v. Stone, 337 U.S. 662, 69 S.Ct. 1264, 1266, 93 L.Ed. 1613. The facts of the case are simple. A Delaware corporation owned and operated pipe lines in Mississippi. It picked up oil in the oil fields in Mississippi and transported it to railroad loading tracks also in Mississippi. At the loading tracks the oil was pumped into railroad cars for shipment out of the State. The pipe line company acted as agent of the owners of the oil in transporting it and in arranging with the railroad for the out-of-state shipment. The State of Mississippi imposed "annual privilege taxes, measured by the amount or volume of business done," Code 1942, § 10105, upon a wide variety of enterprises. With respect to persons transporting oil or gas in pipe line for compensation or hire between two points in the State, the tax levied was 2% of the gross income of the business. The Mississippi court held this tax validly applicable to the business of the pipe line company.

Mr. Justice Rutledge delivered an opinion in which he was joined by Justices Black, Douglas and Murphy. These Justices found it unnecessary to decide whether the activity of the pipe line company was technically interstate or intrastate commerce; in either event, they said, Mississippi had the power to impose the tax. They rejected the contention that the tax was invalid merely because it imposed "a 'direct' tax on the 'privilege' of engaging in interstate commerce" and argued that the Commerce Clause did not invalidate the tax. This position was not accepted by a majority of the court and was repudiated by the Spector case.

In a separate opinion Mr. Justice Burton concluded that the tax was upon the privilege of transporting oil in intrastate rather than interstate commerce. Such conclusion enabled him to uphold the validity of the tax without further consideration of its actual effect upon interstate commerce. On that basis he stated that it was unnecessary to decide whether or not a privilege tax could validly be imposed upon the privilege of transporting oil in Mississippi in interstate commerce. He expressly refused to join in Mr. Justice Rutledge's opinion.

Mr. Justice Reed delivered an opinion in which he was joined by Chief Justice Vinson and Justices Frankfurter and Jackson. In the first part of the opinion he concluded that the pipe line company actually was engaged in interstate commerce. In the second part of the opinion he concluded that a privilege tax for carrying on a wholly interstate transportation business measured by a fairly apportioned part of the gross receipts was invalid. In so concluding he observed:

"Phrased in terms of a privilege for carrying on an interstate business, such a tax historically has been deemed unconstitutional. The cases abound in statements to the effect that the privilege of carrying on interstate commerce itself is immune from state taxation. This is because it is a privilege beyond the power of a state to grant. '* * * it is a right which

every citizen of the United States (and every corporation) is entitled to exercise under the constitution and laws of the United States; * * *'. Crutcher v. [Commonwealth of] Kentucky, 141 U.S. 47, 57, 11 S.Ct. 851, 853, 35 L.Ed. 649 [652]; International Textbook Co. v. Pigg, 217 U.S. 91, 30 S.Ct. 481, 54 L.Ed. 678, 27 L.R.A.,N.S., 493, 18 Ann.Cas. 1103. The cases hold not only that a state may not exact a tax as a condition precedent to the doing of interstate business, but also that it may not levy privilege, excise or franchise taxes on a foreign corporation for the privilege of carrying on or the actual doing of solely interstate business after its admission to the state. Ozark Pipe Line Corp. v. Monier, 266 U.S. 555, 45 S.Ct. 184, 69 L.Ed. 439; Alpha Portland Cement Co. v. [Commonwealth of] Massachusetts, 268 U.S. 203, 45 S.Ct. 477, 69 L.Ed. 916, 44 A.L.R. 1219".

So by virtue of the limited approval of Mr. Justice Burton of the Mississippi Court's decision, and not for the reasons advanced by Justice Rutledge, did the decision of Justice Rutledge temporarily (until Spector) become the decision of the Court.

In the Spector case the Court followed the opinion of Mr. Justice Reed in the Interstate Oil Pipe Line case, and not that of Mr. Justice Rutledge. Thus, the quotations from the Interstate Oil Pipe Line case in the State's brief are now not controlling and Justice Reed's pertinent statement quoted above controls the decision in the case at bar. Later decisions of the Supreme Court of the United States and other decisions since Spector have reaffirmed without question that the holding that a tax on the privilege of doing an exclusively interstate business contravenes the Commerce Clause of the Constitution of the United States. Memphis Steam Laundry Cleaner, Inc., v. Stone, 342 U.S. 389, 72 S.Ct. 424, 96 L.Ed. 436; Railway Express Agency, Inc.,

v. Commonwealth of Virginia, 347 U.S. 359, 74 S.Ct. 558, 98 L.Ed. 337.

In the case at bar the State has sought to emphasize the fact that Plantation has qualified to do business in Alabama and has obtained an annual permit. These facts are immaterial. Plantation qualified and sought under protest a permit to engage only in "interstate transportation by pipe line of products refined from petroleum." In the Spector case, Spector qualified to do business in Connecticut and the tax was on the doing of business and the privilege of doing business. As a matter of fact Plantation has followed the exact procedure followed by the taxpayer in Ozark Pipe Line Corp. v. Monier, supra, in which the imposition of the tax was held invalid.

We note that the State also relies upon decisions by this Court in Sanford v. City of Clanton, 244 Ala. 671, 15 So.2d 309, and Sanford v. City of Andalusia, 256 Ala. 507, 55 So.2d 856. These cases are clearly not applicable in the case at bar since in these cases there is no tax or burden upon commerce. The burden falls and the duties are laid not upon the transportation but upon the delivery as an act in consummating a sale between persons who may or may not have an interest in the transportation but whose relationship is exclusive of transportation. And so we say again that imposition of the Alabama franchise tax in the case at bar is unconstitutional and void and this brings us to the last question in the case in which the State contends that the proceedings in regard to the 1942 franchise tax are res adjudicata in this case.

■ IV. The appellant appears to insist upon its plea of res judicata claiming that the decree in the Plantation Pipe Line case involving the 1942 franchise taxes, Case No. 13040, is binding upon Plantation with respect to its franchise tax for 1952.

It appears that by agreement between Plantation Pipe Line and the State, Plantation settled its tax liability for 1942–48 for

franchise taxes and permit fees. The agreement of the parties with respect to that settlement is set forth in a letter dated December 30, 1948. The agreement, according to this letter, provided:

"The Company will not appeal from or otherwise attack assessment of the franchise taxes or permit fees for these years, reserving, however, all rights with respect to taxes for future years."

The letter is dated December 30, 1948. It states that a consent decree dismissing the appeal with respect to the year 1942 initialed by the attorney for Plantation at a conference in Montgomery on December 28th will be entered today or tomorrow. The consent decree which was entered on December 30, 1948, bears in the lower left-hand corner opposite the Judge's signature "OK J.F.J." It now appears that there is a misunderstanding about the matter and the State takes the position that the statement contained in the letter is purely unilateral as there is no evidence to the effect that the State ever agreed to any such thing. The lower court made no finding or determination as to any question of fact in connection with the settlement of Plantation's 1942 franchise tax liability. Accordingly, we are unable to say that the present suit is concluded by the former adjudication since we do not know that the matters of the two suits are the same and the issues in the former suit were broad enough to have comprehended all that is involved in the second suit. Tankersley v. Pettis, 71 Ala. 179.

There is an annotation on the question of "Judgment in tax cases in respect of one period as res judicata in respect to another period" in 150 A.L.R., beginning at page 5. A statement of applicable principles as here set forth is sufficient to disclose that the consent decree with respect to the 1942 franchise tax is not res judicata in this proceeding.

"Generally, where in a proceeding concerning a tax for a particular period a judgment is rendered which determines that the taxpayer or his property is taxable or is exempt from taxation, but is not supported by a finding or findings specifying the grounds or facts upon which the conclusion is reached, such judgment has been held not to settle conclusively the question that the taxpayer or his property is taxable, or exempt from taxation, for a different period not involved in the former proceeding. This observation is borne out by nearly all the cases, irrespective of the theory upon which the result is reached under the particular circumstances of an individual case." 150 A.L.R. at page 63.

"The general rule that 'a judgment on one cause of action is not conclusive in a subsequent action based upon a different cause of action as to questions of fact which might have been but were not litigated and determined in the prior action' (see Am.Law.Inst. Restatement, Judgments § 68, Comment d), has been applied where taxes for different periods were involved in successive proceedings." 150 A.L.R. at page 32.

The settlement with respect to 1942 was by agreement. Assuming that the State is not legally bound by agreement that Plantation would have the right to litigate with respect to other years, there is no finding in connection with 1942 specifying the grounds upon which the conclusion as to taxability was predicated. In fact there is no judicial finding or determination as to any question of fact in connection with the agreed settlement of Plantation's 1942 franchise tax liability.

In Gillespie v. Commissioner of Internal Revenue, 10 Cir., 151 F.2d 903, 906, the court in speaking of the doctrine of res judicata, said:

"The doctrine does not apply when the judgment pleaded as an estoppel is based upon controlling state decisions subsequently repudiated by supervening decisions, thereby necessitating re-ex-

amination and application of state law to the Federal question. Blair v. Commissioner, 300 U.S. 5, 57 S.Ct. 330, 81 L.Ed. 465. Or where authoritative decisions of the Federal courts repudiate the judgment pleaded as an estoppel, thereby having the effect of perpetuating acknowledged error. Henricksen v. Seward [9 Cir., 135 F.2d 986] supra. But see Commissioner [of Internal Revenue] v. Western Union Telegraph Co. [2 Cir., 141 F.2d 774], supra. It is rightly said that the doctrine should be sparingly applied in tax cases involving liability for different years, and generally it is not applied where the taxable events and transactions are by their nature fluid and subject to change from year to year."

Under the circumstances we do not consider that the consent decree of 1942 constitutes res adjudicata of the issues in the present case.

It results that the decree of the lower court is due to be affirmed.

Affirmed.

MERRILL, J., concurs.

LIVINGSTON, C. J., concurs in the result.

LAWSON, J., concurs specially.

LAWSON, Justice (concurring specially).

I concur in the opinion prepared for the Court by Mr. Justice STAKELY except insofar as it treats of the constitutionality of the statutes here involved. Since the Court holds those statutes to be applicable only to intrastate business and that the taxpayer is engaged exclusively in interstate business, there is no occasion to write to the constitutional question as to whether those statutes would be constitutional if construed as applying to interstate commerce. We have a long line of cases which hold that the constitutionality of a statute will not be determined unless absolutely necessary to determine the merits of the suit in which the constitutionality of such statute has been drawn in question. Smith v. Speed, 50 Ala. 276; Shehane v. Bailey, 110 Ala. 308, 20 So. 359; Smith v. McQueen, 232 Ala. 90, 166 So. 788; State ex rel. Bland v. St. John, 244 Ala. 269, 13 So.2d 161; Moses v. Tarwater, 257 Ala. 361, 58 So.2d 757; Donaghey v. Owen, 259 Ala. 376, 66 So.2d 895. See Alabama State Federation of Labor, Local Union No. 103, etc., v. McAdory, 325 U.S. 450, 65 S.Ct. 1384, 89 L.Ed. 1725. The opinion in this case shows no reason why this salutary rule is not applicable and I feel that to ignore that rule will result in having the instant case cited in the future as showing that the Court followed the rule only when it feels it convenient to do so.